HARLINGTON WOOD, Jr., Circuit Judge:
 

 This is an appeal from the United States District Court for the Southern District of Florida which upheld the Findings of Fact and Conclusions of Law of the Bankruptcy Court. Appellants, Penthouse International, Ltd. (hereinafter “Penthouse”) and Arthur Dooley, Trustee and disclosed agent of Penthouse, seek to recover $500,000 deposited with the appellee, Kenneth J. Weil, Trustee in Bankruptcy in the Estate of Barbara Garfinkle, Bankrupt, pursuant to a Contract for Purchase and Sale (hereinafter the “Contract”) of a Miami Beach, Florida oceanfront hotel, the Eden Roc (hereinafter the “Hotel”). We affirm.
 

 I.
 

 The Barbara Garfinkle bankruptcy estate included a parcel of real property upon which the Hotel was located. In 1978, the legalization of casino gambling in Dade County, Florida, which incorporates Miami Beach, became the subject of a state-wide referendum. In late September or early October of 1978, Dooley approached the Trustee in Bankruptcy with regard to buying the Hotel.
 

 The parties began negotiating a contract and discussed several matters relevant to this appeal. First, Dooley demanded as a condition of negotiation that the Bankruptcy Court sign and approve any contract before November 7, 1978, the day of the referendum vote. Although the outcome of the referendum would materially affect the value of the Hotel, Penthouse claimed that it was interested in buying the Hotel regardless of the outcome of the casino gambling vote.
 

 Second, Penthouse wanted to acquire fee simple title. There were two 999-year leases on the Hotel and an underlying fee. The Trustee in Bankruptcy proposed that the court cancel the leases at closing; any liens against either the leasehold or the fee would be paid out of the fund created by the sale proceeds. The Trustee could then convey fee simple title. Penthouse indicated that the procedure was acceptable.
 

 The parties also discussed the manner in which any possible appeal by the Bankrupt would be handled. At the time of negotiations, the Bankrupt asserted that the Bank
 
 *1343
 
 ruptcy Court had no jurisdiction over the Hotel and had expressed an intention to appeal any order approving a sale. Dooley proposed that a title insurance policy insure over the risk, i.e., not except risk of loss from an appeal by the Bankrupt from its coverage, and that the sale then be closed under Rule 805 of the Bankruptcy Rules.
 
 [1]
 
 Penthouse did not object to this procedure.
 

 Finally, the parties discussed enforcement of the Contract against the Trustee in Bankruptcy. The Trustee in Bankruptcy took the position that the Contract need contain no provisions for enforcement against him because, as an officer of the Bankruptcy Court, he could be compelled to perform by the Court. Penthouse agreed with this position.
 

 The proposed Contract was submitted to the creditors of the Bankrupt’s Estate on an order to show cause entered by the Bankruptcy Judge on October 19, 1978. The proposed Contract provided for a $10,000,-000 purchase price and for a deposit of $500,000 which the purchaser would forfeit upon failure to close in accordance with the Contract. The Contract was publicized by the Bankruptcy Court’s Order to Show Cause Re Sale of Assets which invited all interested persons to attend a November 3, 1978 hearing, at which objections to the sale and higher or better offers would be considered.
 

 At the schedule hearing, the bidding was restricted to persons having a deposit of $500,000. Appellants were the successful bidders at the increased price of $15,500,-000. Between November 3 and November 6, 1978, the parties drafted what would become the Bankruptcy Court’s Order Approving and Confirming Sale of Assets Free and Clear of Liens. Signed on November 6, 1978, that Order set forth the procedure for cancelling the two 999-year leases on the Hotel and directed the Trustee in Bankruptcy to close the sale in accordance with the Contract. The Trustee in Bankruptcy then executed the Contract in accordance with the proposed terms. On the same day, the Bankruptcy Judge specifically requested that Penthouse inform the Trustee of its “economic decision” following the referendum since Penthouse could forfeit its deposit if it chose not to go through with the sale. Dooley assured the Court that the purchaser would notify the Trustee when such a decision was made.
 

 On November 7,1978, the state-wide casino gambling referendum was soundly defeated. Thereafter, the Trustee in Bankruptcy proceeded to discharge his contractual obligations. Pursuant to the Contract, the Trustee delivered a Commitment for Title Insurance from Pioneer National Title Insurance Company to Penthouse.
 
 [2]
 
 The Trustee in Bankruptcy also attempted repeatedly to determine if and when the appellants would close, but was not given an answer.
 

 When Penthouse received the title commitment, it hired a Florida real estate attorney to “see whether the contract was a valid and enforceable contract or what the options were with respect to that contract given the title commitment.” Penthouse objected to the Commitment for Title Insurance, claiming that all entries in Schedule B-I (list of things to be done or documents to be provided before policy is issued) and Schedule B-II (exceptions to coverage) constituted defects in title and demanded that the Trustee in Bankruptcy cure these defects within ten days upon pain of rescission. The Trustee interpreted the letter as a letter of rescission because it cited as defects the very procedures for handling known problems that had been previously negotiated. On January 31, the Trustee wrote Dooley explaining why the Commitment for Title Insurance met the Contract
 
 *1344
 
 requirements and further expressed his continued willingness to close the sale. The Trustee in Bankruptcy received no reply and on February 15, 1979, he wrote appellants and informed them that the Bankrupt’s Estate would retain the $500,000 deposit.
 

 On February 16, 1979, Penthouse filed an Adversary Complaint in the Bankruptcy Court seeking recovery of the $500,000 deposit. Dooley claimed that (1) the Trustee in Bankruptcy had defaulted by failing to provide marketable title and/or title as required by the Contract; (2) the Contract was void and unenforceable for lack of mutuality; and (3) the plaintiffs were not bound by the Contract because the Bankruptcy Court had permitted another party to bid on the Hotel without posting a $500,-000 deposit.
 
 [3]
 

 The Bankruptcy Court dismissed the claim which was directed to the alleged impropriety of the bidding process with prejudice and without leave to amend. The court further found that the Commitment for Title Insurance showed that a title insurance policy would be issued and that title would be conveyed in compliance with the Contract. The court also stated that Penthouse was estopped and/or had waived its right to claim relief from forfeiture of its deposit based on matters the parties had agreed to during the negotiating and contracting process. Finally, the court observed that plaintiffs were precluded from receiving relief because they stood before it with unclean hands. The Bankruptcy Court entered judgment in favor of the Trustee in Bankruptcy and the District Court affirmed these rulings without opinion.
 

 II.
 

 The Bankruptcy Court’s findings must be affirmed unless clearly erroneous.
 
 Acacia Mutual Life Ins. Co. v. Perimeter Park Invest. Assoc.,
 
 616 F.2d 150 (5th Cir. 1980);
 
 Fruehauf Corp. v. Revitz,
 
 569 F.2d 1364 (5th Cir. 1978).
 

 The test for . . . this Court, is not whether a different conclusion from the evidence would be appropriate, but whether there is sufficient evidence in the record to prevent clear error in the trial judge’s findings.
 

 Highland Village Bank v. Bardwell,
 
 610 F.2d 228, 230 (5th Cir. 1980). Strict application of the clearly erroneous doctrine becomes paramount when, as here, the District Court affirmed the Bankruptcy Court’s findings.
 
 DeMet v. Harralson,
 
 399 F.2d 35, 38 (5th Cir. 1978).
 

 Appellants contend that the Trustee in Bankruptcy should return the $500,000 deposit since the title to the Hotel did not conform with Paragraph 6 of the Contract. Paragraph 6 requires the Trustee to convey to appellants at closing “good, marketable and insurable title.” It further provides:
 

 Title shall be deemed good, marketable and insurable for the purposes hereof if [an acceptable title insurance company] will issue an ALTA owner’s policy (standard form B-1969) insuring title without any exceptions other than (i) taxes for the year of closing and subsequent years, (ii) applicable zoning, plat restrictions or other restrictions common to the subdivision (provided the same do not provide for the forfeiture or reversion of the Property, and provided further that neither the same nor any deed restrictions prohibits or interferes with any uses presently being made of the subject Property or with the use of the premises for gambling should the same be hereafter permitted by law), and (iii) the Tenant Leases set forth on Exhibit ‘B’ hereto.
 

 Relying primarily on Exhibit 8, an attorney’s opinion letter which reviews the title
 
 *1345
 
 commitment of Pioneer Title
 
 [4]
 
 against the requirements of Paragraph 6, appellants raise several objections.
 

 In general, appellants claim that the title is not marketable. Marketable title is unencumbered title, free from reasonable doubt as to any question of law or fact necessary to sustain its validity.
 
 Winkler v. Neilinger,
 
 153 Fla. 288, 14 So.2d 403 (1943); Walker v.
 
 Close,
 
 98 Fla. 1103, 125 So. 521,
 
 reh. denied,
 
 98 Fla. 1125, 126 So. 289 (1930);
 
 Wheeler v. Sullivan,
 
 90 Fla. 711, 106 So. 876 (1925). Marketable title is not necessarily perfect title, nor must it satisfy the purchaser or his attorney, unless there is an express stipulation to that effect. Adams
 
 v. Whittle,
 
 101 Fla. 705, 135 So. 152 (1931). We will thus review each of appellants’ specific objections to determine whether any of the alleged defects render title to the Hotel unmarketable.
 

 Appellants first contend that cancel-ling and terminating the two existing 999-year leases on the premises in order to convey fee simple title creates such an unsettled state of title that appellants are not required to accept it. The operative part of the Contract, however, defines acceptable title in terms of exceptions to the policy and requires only that the Trustee in Bankruptcy deliver a title insurance policy with no exceptions other than those specifically listed as permissible. The Commitment for Title Insurance contained no exception for the possible effects of cancellation of the leases. It only listed cancellation as something to be done prior to closing.
 
 [5]
 

 Appellants also object to the procedure for handling the Bankrupt’s appeal of the Order Approving and Confirming Sale of Assets Free and Clear of Liens. Such an appeal would be handled by insuring over the risk. Appellants never objected to this procedure and the Commitment for Title Insurance contained no exception for the possible effects of an appeal by the Bankrupt from the sale order.
 
 [6]
 

 The next group of objections relates to a six-foot strip of land west of Collins Avenue, a principal Miami Beach street. The Hotel is located between the Atlantic Ocean on the east and Collins Avenue on the west. Bordering Collins Avenue on the west is a six-foot strip of land which provides a buffer between Collins Avenue and the Indian River. This strip of land is owned by the Hotel and was to be conveyed to appellants along with the actual Hotel site which is east of Collins Avenue.
 

 In 1955, Collins Avenue was widened to its present width, requiring the paving over of what was then a natural strip of land between the existing road and the Indian River. This in turn required the filling in of part of the Indian River, a navigable waterway, to create a new buffer. When land is created by filling in part of a navigable waterway, a navigational servitude results. Appellants contend that this navigational servitude is a title defect and contract violation.
 

 The evidence at trial, however, showed that the navigational servitude was a permissible exception to the title insurance policy under Paragraph 6(ii) of the Contract. The quantity of land involved is only a six-foot strip of land and involves a servitude which applies to every hotel on the strip that owns a parcel on the west side of Collins Avenue. The servitude in no way affects the utility of the Hotel property, the quality of the property, or the quality of the title being given. Moreover, reservations by the federal government in aid of navigation do not constitute title defects so
 
 *1346
 
 as to destroy marketability of title.
 
 Normandy Beach Properties Corp. v. Adams,
 
 107 Fla. 583, 145 So. 870 (1933).
 

 Similarly, appellants object to the reservation by the state of Florida of mineral rights with respect to the six-foot strip of land west of Collins Avenue. Whenever land is filled in and conveyed by the state of Florida, the Trustees of the Internal Improvement Fund retain mineral rights. This reservation is permissible under Paragraph 6(ii) of the Contract because every out parcel west of Collins Avenue owned by a hotel in the subdivision is subject to the same reservation. Moreover, like navigational servitudes, mineral reservations by the Trustees of the Internal Improvement Fund do not constitute valid title objections.
 
 Normandy Beach Properties
 
 v.
 
 Adams,
 
 107 Fla. 583, 145 So. 870 (1933);
 
 Thomas v. Wood,
 
 37 F.2d 856 (5th Cir. 1930). In any event, the state will release the reservations when something is actually built on the strip.
 

 Finally, appellants object to a temporary beach easement and erosion control line established by the Trustees of the Internal Improvement Fund. These appear as special exceptions in the Commitment for Title Insurance. The easement and control line arise out of the crisis Miami Beach faced with regard to its disappearing beach. In order to fill in the beach, a majority of hotel owners gave temporary access easements and in order to preserve the beach after it was filled, an erosion control line was established which prevents construction beyond a certain point on the beach. The evidence at trial showed that both the easement and the control line were restrictions common to the subdivision and thus permissible exceptions to the title insurance policy. In addition, the evidence showed that they did not affect the value, use, or marketability of the property; in fact, these exceptions benefit the property.
 

 We find that none of appellants’ objections render title unmarketable. In fact, there was other evidence that indicated that the alleged defects were not bona fide objections, but were excuses calculated to relieve appellants of their contractual obligations. One week after the casino gambling referendum was defeated, Dooley called the Trustee in Bankruptcy and told him that he could not justify the purchase price because of the referendum defeat, and asked the Trustee whether he could sell the Hotel at a lower price. Penthouse also began investigating the other high bidder without “alerting” the Trustee in Bankruptcy. Moreover, there was a scheduled hearing in the Bankruptcy Court on several questions concerning the interim operation of the Hotel. Counsel for Penthouse was reluctant to appear at the hearing because “he could be asked to reaffirm the intent to close and his response could be relied upon in reaching a decision possibly raising issues of bad faith and/or liability,” and because his appearance might “serve as a reminder of the conflict between the leases and [the] contract, thus eliminating whatever small chance . . . that the conflict is overlooked and a defect in title is created.” Finally, between November 8, 1978, and the end of January, 1979, the Trustee repeatedly asked appellants whether or not they intended to close in light of the defeat of the casino gambling referendum. No answer was given, but each time Penthouse assured the Trustee that it would inform the Trustee of its “economic decision” when it was made.
 

 III.
 

 In addition to finding that the Trustee in Bankruptcy had complied with the Contract, the Bankruptcy Court held that appellants were estopped and had waived the right to assert the claims relating to the leases and the Bankrupt’s appeal.
 
 [7]
 
 Estoppel is an equitable doctrine
 
 *1347
 
 which prevents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position. Estoppel requires (1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated.
 
 See, e.g., Minerals & Chemicals Philipp Corp. v. Milwhite Co.,
 
 414 F.2d 428 (5th Cir. 1969);
 
 Richards v. Dodge,
 
 150 So.2d 477 (Fla.App.1963);
 
 State ex rel. Watson v. Gray,
 
 48 So.2d 84 (Fla.1950). Silence or acquiescence may be sufficient conduct to create an estoppel if under the circumstances there was both a duty and opportunity to speak.
 
 Ennis v. Warm Mineral Springs, Inc.,
 
 203 So.2d 514, 520 (Fla.App.1967);
 
 Richards v. Dodge,
 
 150 So.2d 477, 481 (Fla.App.1963).
 

 Appellants were aware of the need to cancel the 999-year leases in order to convey a fee simple title and of the potential appeal by the Bankrupt. There was testimony that appellants specifically asked how these problems would be handled during negotiation, that the procedures used were the only options available to create marketable title, and that the Trustee informed all bidders of the procedures.
 
 [8]
 
 The Trustee in Bankruptcy relied upon Penthouse’s willingness to contract on those terms. The Trustee would not have entered into the Contract with appellants if they had made their objections known beforehand. Appellants never objected to these solutions during negotiations and when both parties presented the Order to the Court, appellants never indicated that the final Order was unacceptable. The Trustee relied to his detriment since other interested purchasers and bidders would have contracted.
 

 The Trustee also relied on appellants’ acquiescence after the referendum was defeated by preparing for the sale. Appellants had a duty to speak since the Bankruptcy Judge on November 6, 1978, asked appellants to let the Trustee know of their “economic decision” as soon after the referendum as possible so that the Trustee would not “spin his wheels” getting ready for a closing that would never take place. Moreover, when appellants received the title commitment, there was testimony that if they had bona fide objections, they would have contacted the Title Insurer to raise questions. Rather, there was no word from appellants until the January 24, 1979, letter electing to rescind the Contract.
 

 The related concept of waiver is the intentional relinquishment of a known right.
 
 Fireman’s Fund Ins. Co. v. Vogel,
 
 195 So.2d 20 (Fla.App.1967);
 
 Gilman v. Butzloff,
 
 155 Fla. 888, 22 So.2d 263 (1945);
 
 Rader v. Prather,
 
 100 Fla. 591, 130 So. 15 (1930). Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. Waiver may be express, or, as in this case, implied from conduct. A party may waive any right which it is legally entitled to, including rights secured by contract.
 
 Fireman’s Fund Ins. Co.,
 
 195 So.2d at 24;
 
 Rader,
 
 130 So. at 17. When waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case. Furthermore, waiver does not arise from forbearance for a reasonable time.
 
 Fireman’s Fund,
 
 195 So.2d at 24.
 

 
 *1348
 
 At an earlier point in time, appellants may have had the right to object to purchasing property based on a sale order that was being appealed and the right to refuse to accept court ordered cancellation of the leases as an acceptable way of creating fee simple title. Moreover, it is clear that appellants were aware of these rights. The record, however, reveals a somewhat frustrating attempt by the Trustee in Bankruptcy to acquire full information from the appellants. Appellants acquiesced in the contracting process and were silent after the referendum vote. Their conduct warrants the inference of relinquishment of a known right.
 

 Waiver is usually a question of fact since it concerns the intent of the parties.
 
 Davis v. Davis,
 
 123 So.2d 377 (Fla.App.1960). Resolving factual issues depends upon the credibility of witnesses and the Bankruptcy Judge’s opportunity to view and hear the testimony is of paramount importance.
 
 See, e.g., In re Ostrer,
 
 393 F.2d 646 (2d Cir. 1968). The evidence presented at trial supports the Bankruptcy Court’s findings.
 

 IV.
 

 The Complaint to recover the $500,000 deposit from the Trustee included Count Three which alleged that certain bidding guidelines were not followed at the November 6, 1979 sale. The Order to Show Cause restricted bidding to persons having a deposit of $500,000. Appellants claim that during the course of the hearing, a bidder was permitted to participate in the bidding without complying with the deposit requirement. Thus, appellants were required to outbid a person who failed to demonstrate sufficient financial responsibility. Therefore, appellants claim that they cannot be bound by the Contract if the underlying sale and order confirming it should be set aside.
 

 Count Three is neither an appeal of the Order Approving and Confirming Sale, nor a motion for relief from the Order under Fed.R.Civ.P. 60, made applicable to bankruptcy cases by Rule 924, Rules of Bankruptcy Procedure. Rather, it is a col-lateral attack since it attacks the Contract in an adversary complaint, rather than the Order Approving and Confirming Sale. An order of sale cannot be collaterally attacked.
 
 Slocum v. Edwards,
 
 168 F.2d 627 (2d Cir. 1948);
 
 In re Lewis Jones, Inc.,
 
 369 F.Supp. 111 (E.D.Pa.1973); 4B Collier on Bankruptcy ¶ 70.98[18] (14th ed. 1978). Thus, appellants are attempting to indirectly avoid contract obligations that could not be avoided directly.
 

 In any event, even if appellants had properly stated their claim through an appeal of the Order or a Rule 60 motion, they would not have a successful cause of action. The deposit was to be retained by the Trustee in the event that the sale was approved by the court and the bidder failed to close. The purpose of requiring the deposit was solely for the benefit of the Trustee.
 

 Some grounds which might ... be raised by the trustee are personal to, and may be waived by, him, not being assertable by others. This is the situation, for example, with respect to failure of bidders to comply with a requirement that they make preliminary deposits. . . .
 

 Remington, H. 6
 
 Bankruptcy Law
 
 § 2563 (5th Ed. 1952);
 
 In Re Rapier Sugar Feed Co.,
 
 13 F.Supp. 85 (W.D.Ky.1935). If an order requiring deposits from prospective bidders were construed to be for the benefit of the bidder, it would tend to stifle bidding, and would be detrimental to the Trustee’s duty to achieve an adequate price to protect creditors.
 
 Rapier Sugar,
 
 13 F.Supp. at 89.
 

 Here we have a successful bidder objecting to a sale to himself. The successful bidder is estopped to complain of the qualifications of the other bidders.
 
 Rapier Sugar,
 
 13 F.Supp. at 89;
 
 In re Jacobson,
 
 4 F.2d 211 (9th Cir. 1925). The district court’s dismissal of Count Three is affirmed.
 

 The judgment of the district court is AFFIRMED.
 

 [1]
 

 . Rule 805 provides that a sale is not affected by a subsequent reversal or modification on appeal if the order approving sale is not stayed pending appeal. In this case, since no stay was entered, title could have been conveyed to appellants and such title would not have been affected by the outcome of an appeal.
 

 [2]
 

 . Although title was not to be conveyed until closing, it was to be demonstrated to be so conveyable by November 30, 1978.
 

 [3]
 

 . Plaintiffs also argued that the Contract was void for want of mutuality of remedy or enforceability based on the absence of any contract remedy for enforcement against the Trustee in Bankruptcy. The Bankruptcy Court found that claim totally without merit since the Trustee was subject to court order. Moreover, it held that plaintiffs were estopped and had waived the right to claim that the Contract was void. Plaintiffs have apparently abandoned their claim of lack of mutuality on appeal.
 

 [4]
 

 . The commitment is not the actual policy. It shows what must be done prior to issuance of the policy and what the actual policy will look like once issued.
 

 [5]
 

 . The court’s Order Approving and Confirming Sale directed the Trustee to cancel the leases at the appropriate time.
 

 [6]
 

 .The only mention of the effects of the Bankruptcy proceedings as an exception was contained in subparagraphs (1) and (m) of Schedule B II 3. Following those paragraphs, however, it was expressly stated that the exceptions would be removed from and not appear in the final title insurance policy once the list of things to do contained in Schedule B I of the Commitment had been accomplished.
 

 [7]
 

 . The Bankruptcy Court also found that plaintiffs were precluded from receiving relief because they stood before the court with unclean hands. The equitable doctrine of unclean hands provides that:
 

 [0]ne who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in
 
 *1347
 
 his wrongdoing he may have kept himself strictly within the law.
 

 Peninsula
 
 Land
 
 Co. v. Howard, 149 Fla. 772, 6 So.2d 384, 389 (1941). The doctrine is applicable in a court of equity to deny a plaintiff the relief he seeks even though his claim might otherwise be meritorious. The principles of equity govern the exercise of a bankruptcy court’s jurisdiction. Bank
 
 of Marin v. England,
 
 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). Appellants’ behavior after the referendum was defeated supports the finding of unclean hands.
 

 [8]
 

 . For example, at the November 3 hearing, the attorney for the Trustee in Bankruptcy stated in open court that such an appeal would be handled by insuring over the risk.