**In re FOSKO MARKETS, INC., d/b/a AHF Super Deli Mart, Debtor.**

**Bankruptcy No. 86 B 12094 (CB).**

United States Bankruptcy Court, S.D. New York.

May 29, 1987.

Memorandum on Motion for Stay June 11, 1987.

Jaffe & Segal, New York City by David F. Segal, Burton Ross, for landlord.

Kelly, Eckhaus & Mohen, New York City by Thomas P. Mohen, Emanuel G. Tsarnas, for debtor in possession.

**DECISION AND ORDER ON LANDLORD'S MOTION TO DEEM THE LEASE REJECTED OR VACATE THE AUTOMATIC STAY**

TINA L. BROZMAN, Bankruptcy Judge.

We are asked to decide whether a landlord who, learning of its tenant's bank-

ruptcy, promptly moves to deem its lease rejected or vacate the automatic stay and then accepts one month's use and occupation has waived or should be estopped from asserting that the lease has been rejected by operation of law. We hold that no waiver occurred and that no estoppel is warranted.[1]

On October 31, 1986, Fosko Markets, Inc. ("Fosko") filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (the "Code"), and was continued in the operation of its business and properties as a debtor in possession. Fosko is the assignee of one Antonios Foskolos, the tenant under a lease with Amsi Associates, Ltd. ("Amsi") for store premises located in Manhattan. It is undisputed that neither Amsi nor a related entity, Amsi Investors (collectively, the "landlord"), was listed as a creditor by Fosko when its chapter 11 petition was filed.

By notice served on April 8, 1987, the landlord moved this court to declare the lease rejected under Code section 365(d)(4) or to vacate the automatic stay under Code section 362, contending (i) that the lease had been rejected when Fosko failed to assume or reject it or obtain an extension of time to do so within 60 days after the case was filed and (ii) that the landlord was contractually permitted to terminate the lease so as to be able to demolish the building. Fosko countered the motion with the defenses of waiver and estoppel and a challenge to the claim of the landlord that it intended to begin demolition of the building. Because it would have been unnecessary for us to determine whether the lease could be terminated if we were to determine that the lease had been rejected, we conducted an evidentiary hearing on May 6 and May 14, 1987 on the defenses of waiver and estoppel, it being conceded by Fosko that it had not moved to assume or reject the lease or to obtain an extension of time to do so. In fact, Fosko has never moved to assume the lease.

## FACTS

Sometime in March 1978, Fosko moved into the premises and began conducting business. Although the term of the lease was April 1, 1978 through March 31, 1988, Fosko's principals knew from the outset that their stay at the premises was of indefinite duration both because certain provisions in the lease allowed early termination in the event of demolition and because Douglas Oliver ("Oliver"), who is an officer of Amsi and a general partner of Amsi Investors, repeatedly discussed with them his intention to eventually demolish the building. But the principals were content to operate the business for however long they could at that location.

The base rent reserved under the lease was $6,000 per month for the first five years and $6,666.68 per month for the second. The lease provided for additional rent covering water and sewer charges and for an adjustment of 12.9% of the increase in operating costs and taxes. Increases were payable at year end and decreases were to be reflected in lower rent for the installments falling due after the year end.

The debtor's operation was a cash one; Oliver always collected the rent in cash or sometimes cash and a second party check. In return, he would initial the rent bill as paid. He visited the store at least monthly, to collect rent, and often more frequently. For a long period of time and for at least the past year, Oliver's conversations with the debtor have been conducted with Fotios Tagaris ("Tagaris"), its vice president and secretary. Because Tagaris' use of English is somewhat limited (he is of Greek extraction), the store's manager, John Foskolos ("Foskolos"), sometimes listened and helped smooth any language difficulties.

Over the course of the years, the relationship between the landlord and debtor has been quite cordial. Largely as a result of this the parties did not adhere to the literal terms of the lease regarding the debtor's payment obligations. Specifically,

---

1. The case is assigned to the Honorable Cornelius Blackshear in whose absence we heard the landlord's motion.

Oliver usually stopped by mid-month to seek the month's rent; if Fosko did not have it ready on that day, he'd arrange a later date for payment. The practice with respect to the additional rent was similarly loose. When the debtor could, it made $500 or $1,000 cash payments on account. On occasion, Oliver selected store merchandise in partial payment. Although the landlord claims that Fosko was not current on additional rent and escalations and by the end of 1986 owed some $37,000, Oliver admitted that because Fosko was a good tenant and paid its base rent without problems, he allowed Fosko latitude on the other obligations. Tagaris and Foskolos denied that Fosko owed the landlord any prepetition additional rent and escalations. Neither party offered any documentary evidence of payment or demand for payment.

With the exception of the discrepancy as to the pre-petition liability, the testimony of the parties was more or less consistent as to the facts just related. But beginning with what occurred in December, 1986, the versions differed sharply. One important fact, however, was agreed: beginning in December Fosko began paying the landlord $6,900.00 monthly instead of $6666.98, the increase to cover 1986 additional rent and escalations payable in 1987. Oliver testified that on December 19, 1986 he had asked Tagaris to pay some additional rent and escalations; Tagaris asked if Fosko could instead make installment payments. Oliver assented. He requested $7,500.00 a month but accepted the lesser figure plus $100 a month in goods because Tagaris represented that it would be easier for him to make that payment.[2] Oliver also told Tagaris that sometime toward the latter part of January the landlord would be serving them with a ninety day termination notice which Tagaris and he would discuss after the holidays. Oliver flatly denied being informed during the conversation of any bankruptcy filing or other financial difficulties. We found his testimony regarding this conversation to be credible

and congruent with so many of the facts as were undisputed.

Fosko presented several different versions of what supposedly occurred on December 19. In an affidavit submitted in opposition to the landlord's motion, Tagaris swore that in November or December he told Oliver "that while we were having financial trouble" Fosko would continue to pay him $6,900.00 a month. Tagaris testified to something quite different, that when Oliver came to pick up the rent "I told him that the shop had filed for bankruptcy" and that Fosko would continue to pay rent. Tagaris had no memory of whether Oliver responded in any manner.

Foskolos in his affidavit swore that Tagaris told Oliver that they "had temporary financial problems." Foskolos' testimony was wholly confused. It was apparent to the court that he was unable to make up his mind about what story he wanted to tell. He testified at one point that Tagaris told Oliver on December 19 that "we are in bankruptcy" to which news Oliver, looking at first "like even he was pulling his leg or something" asked "what does this mean?" Foskolos testified at another point that around December 22, Oliver returned to the store. Foskolos gave three different versions of what was imparted by Tagaris during this second conversation. First he testified that Tagaris told Oliver that they were in bankruptcy. When confronted with his affidavit swearing that Tagaris told Oliver that they were having temporary financial problems, Foskolos testified that that was what Tagaris had said. When afterwards repeatedly pressed by his counsel as to whether he was perhaps confused, he testified that Tagaris told Oliver both that they were having temporary financial problems and that they had filed a bankruptcy. Notwithstanding that Foskolos had earlier testified that Oliver reacted with surprise on December 19 when informed of the bankruptcy, Foskolos claimed that on December 22 when informed of the bankruptcy Oliver "couldn't believe it." Foskolos also testified that

**2.** The parties agree that Fosko paid $6,900.00 to Oliver each month beginning with December, 1986 and ending with April, 1987.

during this second conversation Oliver was told that "We are going to get someone to handle the case." This made little sense, of course, because the petition was filed by bankruptcy counsel almost two months earlier. Despite all of this testimony about what Tagaris told Oliver, Foskolos also testified that *he* told Oliver on December 22 that "we did go into bankruptcy, chapter 11" and that Oliver "didn't believe it." In addition Foskolos claims to have discussed with Oliver in January and February Fosko's bankruptcy. All of this testimony was incredible. Indeed, given the cordial relationship between Oliver and Tagaris, it would have been odd for Oliver to have sought and obtained an increase in rent to help offset additional rent and escalations at the very same time that he was informed that Fosko had filed a chapter 11 petition.

We find considerably more believable and persuasive Oliver's testimony that he learned nothing about the bankruptcy until March 11, 1987. In late January, as promised, the landlord served a notice of termination on Antonios Foskolos, the assignor of the lease. In February, Oliver gave Tagaris a proposed stipulation pursuant to which the lease would have terminated April 30, 1987. Despite the termination, Fosko would have been permitted to remain on the premises until June 30, 1987 and would have received back its security deposit and a payment from the landlord as compensation for termination of the lease.[3] The testimony is uncontradicted that Oliver in late February began pestering Tagaris to execute and return the stipulation. According to Oliver, on March 10, 1987, he visited the store, again asked Tagaris for the stipulation and for the rent, received the rent and was told by Tagaris that they were unable to sign the stipulation because of some problem with taxes. Oliver asked for and later that day was given the name of an attorney named Pattros who represented Fosko. Pattros told Oliver to call Thom-

as Mohen, Esq. but Oliver was unable to reach Mohen that day. On March 11 Oliver returned to the store only then to be informed by Foskolos in Tagaris' presence that a bankruptcy had been filed. Later that day Mohen returned Oliver's call and confirmed that Fosko had filed a chapter 11 petition.

About three weeks later, the landlord moved to deem the lease rejected or vacate the automatic stay. Thereafter, in mid-April, 1987, after instituting the motion, Oliver collected an additional $6,900. In early May, 1987, Oliver asked for but was not paid May's use and occupation.

## DISCUSSION

The landlord argues that the lease has been deemed rejected pursuant to 11 U.S.C. § 365(d)(4) because Fosko failed to file a motion to assume or reject or to obtain an extension of time to do so on or before December 30, 1986, the 60th day after the Chapter 11 petition was filed. The relevant subsection of § 365, added by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, provides, in pertinent part:

> if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order of relief, or within such additional time as the court, for cause, within such 60–day period fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

In a voluntary chapter 11 case, the powers, functions and duties of the trustee, with certain exceptions not germane here, are conferred on a debtor in possession and the "date of the order for relief" is the date on which the chapter 11 petition was filed. 11 U.S.C. §§ 301 and 1107(a).

The Code does not prescribe what a debtor must do to assume a lease within the

---

**3.** Interestingly, the stipulation made no mention of the claimed $37,000 in arrearages; Oliver testified that he was prepared to forgive them if the stipulation were executed. Moreover, Fosko's accountant testified that he knew of no unpaid additional rent or escalations as of the time that the bankruptcy was filed. This all casts doubt on Oliver's claim that such large sums were unpaid. We make no finding as to the amount, if any, which was due to the landlord for the pre-petition period.

meaning of section 365(d)(4). Although no assumption is effective until the court approves the trustee's action, 11 U.S.C. § 365(a), *see In re J. Woodson Hays, Inc.,* 69 B.R. 303, 15 Bankr.Ct.Dec. (CRR) 597, 599 Bankr.M.D.Fla.1987), it is fairly well established that for purposes of section 365(d)(4), the trustee assumes the lease of nonresidential real property "when he makes up his mind to do so and communicates his decision in an appropriate manner, such as by filing a motion to assume." *By-Rite Distributing, Inc. v. Brierley (In re By-Rite Distributing, Inc.),* 55 B.R. 740, 753 (D.Utah 1985); *In re Wedtech Corporation,* 72 B.R. 464, 467 (Bankr.S.D.N.Y. 1987); *In re Re-Trac Corp.,* 59 B.R. 251, 255 (Bankr.D.Minn.1986).

■ *By-Rite* expressly left open the question whether any actions short of filing a motion to assume constitute an assumption of the lease. 55 Bankr. at 742 n. 5. Some courts have held that any unequivocal act manifesting an intention to assume is sufficient to constitute an assumption, others that only a motion suffices. *Compare In re Ro-An Food Enterprises, Ltd.,* 41 B.R. 416, 418 (E.D.N.Y. 1984) and *Re-Trac Corp.,* 59 B.R. at 255, *with In re BDM Corporation,* 71 B.R. 142 (Bankr.N.D.Ill.1987); *Victoria Station, Inc. v. Turgeon (In re Victoria Station, Inc.),* 69 B.R. 110, 111 (Bankr. 9th Cir. 1986); *Treat Fitness Center, Inc. v. Rainbow Investment Co., (In re Treat Fitness Center Inc.),* 60 B.R. 878 (Bankr. 9th Cir. 1986); and *In re Bon Ton Restaurant and Pastry Shop, Inc.,* 52 B.R. 850, 854 n. 6 (Bankr.N.D.Ill.1985). Although we agree with the latter line of cases, it matters little here, for Fosko neither moved to assume nor manifested by an unequivocal act its intention to assume. Fosko simply paid rent, and, if the affidavit of its counsel be credited,[4] announced at meetings of its creditors of which the landlord had no notice that the debtor intended to assume the lease. The payment of rent within the 60 day period is mandated by 11 U.S.C.

§ 365(d)(3) and therefore cannot constitute an unequivocal act manifesting an intent to assume. *Re-Trac Corp.,* 59 B.R. at 255. Nor can an expression to someone other than the landlord of an intent to assume constitute an unequivocal act. Thus, even assuming that something short of a motion might constitute an assumption, there clearly has been no assumption of this lease.

But the failure to assume is not necessarily fatal; there are unusual cases where the landlord may be deemed to have waived or be estopped from asserting the rejection by operation of law. *Accord In re J. Woodson Hays, Inc., supra,* 69 B.R. 303, 15 Bankr.Ct.Dec. 597. We previously observed in *In re Westview 74th Street Drug Corp.,* 59 B.R. 747, 753 (Bankr.S.D.N.Y. 1986) that the courts do not favor forfeitures. *See Finn v. Meighan,* 325 U.S. 300, 301, 65 S.Ct. 1147, 1148, 89 L.Ed. 1624 (1945); *In re Queens Boulevard Wine & Liquor Corp.,* 503 F.2d 202, 204 (2d Cir. 1974); *Realties 1430 v. Slaner (In re The Duplan Corporation),* 473 F.Supp. 1089, 1091 (S.D.N.Y.1979). It is equally clear, however, that we should not invoke equity if we "would violate the clear and precise mandate of a governing statute." *Woodson,* 69 B.R. 303, 15 Bankr.Ct.Dec. at 600.

Subsections (d)(3) and (4) of section 365 were enacted to protect landlords; we see no reason why those protections may not be waived by a landlord or why a landlord may not be estopped from enforcing (d)(4) on equitable grounds. *See In re Haute Cuisine, Inc.,* 57 B.R. 200, 203 (Bankr.M.D. Fla.1986); *Woodson,* 15 Bankr.Ct.Dec. at 600; *T.F.P. Resources, Inc.,* 56 B.R. 112, 115 (Bankr.S.D.N.Y.1985); *but cf. In re Senioris Enterprises, Inc.,* 3 Bankr.L.Rep. (CCH), ¶ 71653 (Bankr.N.D.Tex.1987); *Re-Trac Corp.,* 59 B.R. at 256–57. Indeed, under the former Bankruptcy Act, a comparable 60 day period for assumption of unexpired leases contained in section 70(b), 11 U.S.C. § 110(b) (1961) (repealed), was

---

**4.** No transcript of the proceedings was ever furnished to the court. Counsel suggests that the affidavits of the principals of the debtor show that the debtor "continually repeated its as-

sumption of the lease" at the meetings of creditors but, in fact, the affidavits say absolutely nothing of the sort.

waivable by the lessors for whose benefit it was enacted. *Larkin v. Sills*, 377 F.2d 1 (5th Cir.1967); *Entin v. Stevens*, 323 F.2d 894 (8th Cir.1963); *Ten-Six Olive v. Curby*, 208 F.2d 117, 123 (8th Cir.1953). Further, in *Ranch House of Orange-Brevard, Inc. v. Gluckstern (In re Ranch House of Orange-Brevard, Inc.)*, 773 F.2d 1166 (11th Cir.1985), the Eleventh Circuit, relying on *Larkin* and *Entin*, determined in a case decided under the Code that doctrines of waiver and estoppel are available as a matter of law where a lease has been deemed rejected pursuant to a confirmed plan of reorganization. We believe that the availability of the defenses similarly continues unabated under section 365(d). Thus we turn to the facts to determine whether either defense saves this lease for the debtor.

A waiver is generally defined as an intentional relinquishment of a known right. *Hadden v. Consolidated Edison Company of New York, Inc.*, 45 N.Y.2d 466, 469, 382 N.E.2d 1136, 410 N.Y.S.2d 274 (1978); *Dooley v. Weil (In re Garfinkle)*, 672 F.2d 1340, 1347 (11th Cir.1982). It requires "(1) the existence at the time of the waiver [of] a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *Garfinkle*, 672 F.2d at 1347. To determine whether or not there was a waiver we must focus on the landlord's intent as manifested by his acts. *See B.J.M. Realty Corporation v. Ruggieri*, 326 F.2d 281, 282–83 (2d Cir.1964); *Duplan, supra*, 473 F.Supp. at 1091.

We cannot say that this landlord has waived the deemed rejection. All that the landlord did was accept use and occupation for the premises for one month after it learned of the bankruptcy. Certainly, until the lease was deemed rejected, the landlord, had it known of the bankruptcy, was entitled statutorily to accept such payments without waiver of any rights. 11 U.S.C. § 365(d)(3). The decisions are many which hold that even after the lease is deemed rejected, the landlord may freely accept use and occupation payments from a holdover debtor without waiving the

deemed rejection. *See, e.g., Senioris Enterprises, Inc., supra*, 3 Bankr.L.Rep. (CCH) ¶ 71653; *Re-Trac Corp.*, 59 B.R. at 256–57; *In re Las Margaritas, Inc.*, 54 B.R. 98 (Bankr.D.Nev.1985) (dicta). Yet a decision in this district has held that the acceptance of any payments under the lease after the lease is deemed rejected constitutes a waiver. *T.F.P. Resources, supra*, 56 B.R. 112.

Although the facts in *T.F.P. Resources* may have justly warranted the court in finding a waiver, we do not believe that the rule which the decision lays down has universal application. There are instances, as here, where despite accepting amounts due under the lease the landlord manifests from the outset its intent to have the lease deemed rejected. Virtually immediately upon learning of the bankruptcy and before accepting any further payment, this landlord moved to have the lease deemed rejected or to modify the automatic stay. The mere acceptance of payments due under the lease during the pendency of that motion did not suffice to contravene the clear intent evidenced by that motion. In other words, the landlord's conduct did not "evidenc[e] an intent to treat the lease as continuing rather than as terminated." *B.J.M. Realty Corporation, supra*, 326 F.2d at 282, citing *In re Wil-Low Cafeterias*, 95 F.2d 306 (2d Cir.), *cert. denied sub nom. Wil-Low Cafeterias v. 650 Madison Avenue Corp.*, 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533 (1938).

We quarrel as well with the universality of the rule established in the *Re-Trac* line of cases, for we can envision cases where the acceptance of payments due under the lease could, in tandem with other facts, constitute a waiver. Although we breed uncertainty from our refusal to announce a rule which disposes of all cases, we believe that courts are bound to sift all the evidence before determining whether or not a waiver occurred. *See B.J.M. Realty Corporation, supra*, 326 F.2d 281.

We turn, finally, to the defense of estoppel, an equitable principle based on acts or conduct of the party against whom it is sought to be invoked. *See Haute Cuisine,*

*supra,* 57 B.R. at 203. Estoppel requires "(1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Garfinkle, supra,* 672 F.2d at 1346–47. Under New York law an estoppel " 'rests upon the word or deed of one party upon which another rightfully relies and so relying, changes his position to his injury.' " *Triple Cities Construction Co. v. Maryland Casualty Co.,* 4 N.Y.2d 443, 448, 151 N.E.2d 856, 176 N.Y. S.2d 292 (1958), quoting *Metropolitan Life Ins. Co. v. Childs Co.,* 230 N.Y. 285, 130 N.E. 295 (1921). There is nothing in the landlord's conduct once informed of the bankruptcy which reasonably might have caused the debtor to believe that the landlord was agreeing to assumption of the lease, to continued possession pending renegotiation of the lease, or to relaxation of the requirements of section 365. Even prior to learning of the bankruptcy, the landlord was prepared only to negotiate continued possession until June 30, 1987. In short, the debtor's failure to move to extend the time for assumption was in no way attributable to the landlord. And at the time that the motion should have been made the landlord was unaware that a chapter 11 petition had been filed. *Cf. Haute Cuisine, Inc., supra,* 57 B.R. 200.

## CONCLUSION

Fosko having failed to prove either waiver or estoppel, the landlord is entitled to the relief provided by 11 U.S.C. § 365(d)(4). The lease is deemed rejected and the debtor is directed to surrender the property to the landlord no later than June 15, 1987.

IT IS SO ORDERED.

## MEMORANDUM DECISION AND ORDER ON DEBTOR'S MOTION FOR A STAY PENDING APPEAL

■ By decision and order dated May 29, 1987, we deemed the debtor's ("Debtor") lease to its premises rejected by operation of law pursuant to 11 U.S.C. § 365(d)(4)

and directed the Debtor to surrender the property to the landlord ("Landlord") no later than June 15, 1987. In reaching that result we rejected the Debtor's arguments that the Landlord should be estopped from asserting or that it waived its right to assert that the lease was deemed rejected. The Debtor has filed a Notice of Appeal from this order and seeks a stay pending that appeal. Oral argument was entertained today, June 10, 1987, at the close of which we reserved decision. For the reasons that follow, we deny the stay.

Federal Rule of Bankruptcy Procedure 8005 governs the issuance of a stay pending appeal. The standards for the issuance of such a stay are:

1. Appellant is likely to succeed on the merits of the appeal.

2. Appellant will suffer irreparable injury.

3. No substantial harm will come to appellee.

4. The stay will do no harm to the public interest.

*In re Crescenzi,* 58 B.R. 141, 143 (S.D.N.Y. 1986); *Beker Industries Corp. v. Florida Land and Water Adjudicatory Commission (In re Beker Industries Corp.),* 57 B.R. 632, 633 (Bankr.S.D.N.Y.1986). The Debtor has made no showing that it is likely to succeed on appeal. We are not convinced by any of the three arguments advanced.

First and from a legal standpoint, the Debtor argues that our decision is contrary to the holdings in *By-Rite Distributing, Inc. v. Brierley (In re By-Rite Distributing, Inc.),* 55 B.R. 740 (D.Utah 1985) and *In re T.F.P. Resources, Inc.,* 56 B.R. 112 (Bankr.S.D.N.Y.1985). We disagree. In *By-Rite,* the court held that the lease had not been rejected because the debtor had filed timely a motion to assume the lease notwithstanding that the motion was not granted within the statutory 60–day period. In short, the timely filing of the motion to assume preserved the lease. That decision is hardly contrary to our holding for in the case at bar the Debtor *never filed within 60 days from its petition a motion to*

*assume.* Thus, it did not preserve its right.

Nor do we find the decision in *T.F.P. Resources* to be necessarily at odds with our holding. Although Judge Buschman held that the landlord had waived its right to argue that the lease should be deemed rejected, the facts in his case are manifestly distinguishable from the facts in ours. In *T.F.P.*, the landlord had accepted, after the sixty-day period expired, *four* months' rent (although two checks later bounced) and did *not* during that time seek relief with respect to the lease from the bankruptcy court. In our case, the landlord accepted only one month's rent after learning of the bankruptcy and before accepting that rent moved to either deem the lease rejected or lift the automatic stay. It is clear that the landlord's action and inaction in *T.F.P. Resources* differed significantly from the Landlord's here. However, to the extent that *T.F.P. Resources* can be read to establish a universal rule that any acceptance of rent by a landlord subsequent to the expiration of the sixty-day period constitutes a waiver, we disagree. As we stated in our decision, we believe the better view, based on existing caselaw, to be that each assertion of waiver must be analyzed on its facts. Thus, we believe that an appellate court will likely either limit *T.F.P. Resources* to its facts or declare that no universal rule disposes of these waiver cases.

The Debtor next argues that it will likely succeed on appeal because we erred in not discussing the alleged fact that the Landlord accepted a rent payment on March 13, 1987, after the Landlord, by its own account, learned of the bankruptcy and before the Landlord moved to vacate the stay. This argument need not detain us. Indeed, we made a finding on pages 387–88, *supra*, of our decision where we alluded

to Oliver's uncontradicted testimony that he went to the Debtor's premises on March 10, 1987 and received the rent payment. We found more persuasive the Landlord's testimony that at that time, it did not know of the bankruptcy.

■ Last, the Debtor argues that a new and most compelling fact has come to this court's attention which would make it likely that the Debtor would succeed either on appeal or on reargument before this court. Counsel pointed to the affidavit in opposition to the stay where counsel for the Landlord avers that the Landlord's plans for demolition of the building have been delayed and postponed and that the Landlord has received several attractive offers for the premises. Because the Landlord served its termination notice to the Debtor based on his intention to demolish the building (such a termination was allowed under the lease) and because the Landlord now intends to instead rent the premises, the Debtor argues that this court's decision must necessarily change.

This argument misses entirely the crux of our decision. We deemed the lease rejected because the Debtor had failed to move to assume it within 60 days from the filing of the petition. 11 U.S.C. § 365(d)(4). The Landlord's termination notice had no bearing on that holding and should not affect whether the lease is deemed rejected by operation of law under 11 U.S.C. § 365(d)(4).[1]

In summary, the Debtor's arguments do not come close to convincing us that it would likely be successful on appeal. Thus, we need not reach the other factors relating to whether a stay should issue. *See Crescenzi, supra,* 58 Bankr. 141.

By asking us for a stay, the Debtor is seeking to buy the time which we have already denied.[2] To grant a stay here

---

1. The Debtor argues that had we known that the Landlord's intentions for the immediate future had changed, we would have been less inclined to believe Mr. Oliver's testimony. That is simply not the case. As we stated in our decision, the Debtor's witnesses were wholly unconvincing and their testimony was full of contradictions. Mr. Oliver's account of what occurred

was considerably more believable and fit in with so many of the facts as were undisputed.

2. Because the lease expires by its terms in March, 1988, a stay pending appeal would give the debtor the benefit of much if not all of the remaining term of lease, which is precisely what

would run directly afoul of the clear mandate of section 365(d)(4) which states that when the lease is deemed rejected for failure to assume within the statutory time period, the premises shall "immediately" be surrendered to the lessor. We afforded the Debtor 17 days from the date of our decision and see no justification for expanding that time.

Accordingly, the motion for a stay pending appeal is denied.

IT IS SO ORDERED.

the Debtor sought in opposing the Landlord's