In re NEW RIVER SHIPYARD,
INC., Debtor.

No. 05–20958–BKC–JKO.

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale.

Dec. 8, 2006.

James H. Fierberg, Miami, FL, for Debtor.

## ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON CLAIM 27 OF MSM, INC., f/k/a MSM CHARTERS, LLC, AND ORDER TO SHOW CAUSE

JOHN K. OLSON, Bankruptcy Judge.

MSM Charters, LLC, n/k/a MSM, Inc. ("MSM") timely filed Claim 27 against the Debtor in the amount of $987,450.78, later amended after confirmation of the Debtor's chapter 11 reorganization plan to the increased amount of $1,943,804.00. The Debtor formerly operated a shipyard on the New River in Fort Lauderdale; the claim arises out of the dropping of MSM's 130–foot Hatteras motor yacht M/Y Sacajawea from a Syncrolift yacht hoist while the vessel was at the shipyard for survey in connection with its imminent trade-in by MSM on a larger replacement vessel, M/Y One More Toy.

Sacajawea was at the shipyard pursuant to a contract between MSM and the Debtor. That contract expressly waives claims against the Debtor arising out of ordinary negligence and similarly waives economic damages. Although the Debtor disputes that it was negligent at all in the dropping of the Sacajawea, it persuasively argues that MSM has failed to plead any facts which would support a finding that the Debtor was grossly negligent.

The case presents two questions: First, does the contract between the parties bar MSM's recovery of *any* damages against the Debtor? Included within this question are issues relating to the enforceability of the contract, particularly in connection with the waiver of ordinary negligence and of economic loss; whether the damages sought by MSM were reasonably foreseeable; whether MSM is entitled to damages resulting from diminution in value of Sacajawea; and whether MSM took appropriate steps to mitigate its damages. Second, may MSM amend its proof of claim after confirmation of the Debtor's plan? The issues arising under this question include waiver and estoppel, and generally turn on the effect of an order confirming a chapter 11 reorganization plan.

## I. Background

In the fall of 2004, MSM entered into an agreement to trade in the Sacajawea on a larger vessel, One More Toy, f/k/a Liquidity. The price for One More Toy was $12 million cash plus the trade-in of Sacajawea. The deal had a very tight closing schedule, and required an immediate survey of Sacajawea, which in turn required that the vessel be lifted from the water. The Debtor operated a Syncrolift yacht hoist which the Debtor believed was capable of lifting the 130–foot Sacajawea. The parties entered into a repair contract which set forth the parties' respective rights and remedies.

While the Sacajawea was being lifted on November 14, 2004, the Syncrolift failed and the vessel fell, sustaining damages. MSM contends that the Syncrolift was not rated to lift the vessel and that the Debtor was negligent in attempting to do so. The Debtor contends that it was not negligent, that MSM deliberately understated the vessel's weight (at 150 tons) in order to induce the Debtor to lift the vessel to satisfy the short closing schedule on MSM's prospective acquisition of One More Toy, and that the Syncrolift was incapable of lifting the (in fact, much

heavier) *Sacajawea*. In the event, the Syncrolift failed and *Sacajawea* sustained $800,000 damages when it fell.

At the time of the incident, MSM maintained an insurance policy on *Sacajawea* which established the insured value of the vessel at $4,702,500, inclusive of "the hull and material contents including fine art, engines, machinery and everything connected therewith, nothing excluded." This value was confirmed in MSM's Charter Agreement dated July 30, 2004, 3½ months before the Syncrolift failure, which stated that the insured value of the vessel was $4,702,500.

As a result of the damage to *Sacajawea*, the trade-in transaction did not go forward. Instead, **on the same day that Sacajawea *was dropped*,** MSM entered into a cash-only contract to purchase *One More Toy* for $17.5 million. Since the prior contract called for the purchase of *One More Toy* for $12 million plus *Sacajawea*, it is clear and indisputable that the trade-in value of *Sacajawea* prior to its damage was $5.5 million.[1]

MSM sued the Debtor in state court in February 2005, alleging unspecified damages for breach of contract, negligence, gross negligence, diminution in value and bailment. The Debtor filed its voluntary chapter 11 petition three weeks later. The court established a claims bar date of July 11, 2005.

On July 8, 2005, MSM filed a proof of claim (the "Initial Claim") in the amount of $987,450.78, consisting of specific property repair damages of $802,306.78 ("Repair Damages") and loss of charter and broker commissions in the amount of $185,144.00 ("Consequential Damages"). The damage

calculations were supported in a detailed spreadsheet attached to the Initial Claim.

The Debtor objected to the Initial Claim on April 27, 2006 [CP 247]; MSM responded [CP 291] on May 30, 2006, and asserted that the damages due it aggregated $987,450.78.

After the vessel was dropped, MSM caused it to be removed to the Bradford Marine ship repair yard, also located in Fort Lauderdale. Following the completion of repairs in March 2005, MSM retained *Sacajawea* until its sale for $5.3 million on May 10, 2006. Although MSM had regularly chartered the vessel prior to its damage, MSM never offered *Sacajawea* for charter thereafter. Instead, MSM continued to fully crew and provision *Sacajawea* for 15 months following the completion of repairs at the Bradford yard in March 2005 until the ultimate sale in May 2006. MSM claims to have incurred costs of $1,182, 237.00, plus attorneys' fees, in the operation and general maintenance of *Sacajawea* during this period (the "Post–Repair Costs"). These include, *inter alia*, crew wages, routine maintenance of the vessel, maintenance of water toys, restaurant and bar bills and tips, boat shoes for the crew, flowers, car rentals, and interest carrying costs. MSM has also sought to include damages to the vessel it alleges were sustained during Hurricane Wilma, which hit Fort Lauderdale on October 24, 2005, more than eleven months after the Syncrolift failure and eight months after Bradford Marine completed its repairs.

On April 28, 2006, the Debtor filed its amended chapter 11 plan [CP 279] and amended disclosure statement [CP 278]. The disclosure statement was sent to all parties in interest, including MSM, so that they could raise any objections which they

---

1. MSM contends, without any documentary support, that the value of *Sacajawea* prior to the Syncrolift failure was $6.0 million. This contention, belied by all of the documentary evidence, is frivolous.

had prior to my consideration of the disclosure statement.[2]

The disclosure statement filed by the Debtor contained the following description of the MSM damage claim:

Although the Debtor maintained insurance with respect to the casualty, the Debtor's insurance carrier, One Beacon Insurance Company initially declined coverage. The insurer has filed an action in Federal Admiralty Court seeking a declaratory judgment that there was no coverage. The Debtor, through its special counsel Alan S. Wachs, Esq., Volpe Bajalia Wickes Rogerson Galloway and Wachs, 1301 Riverplace Blvd., Suite 1700, Jacksonville, Florida 32207–9023 ("Wachs") defended the action and sought through counterclaim a declaratory judgment that there was coverage and that the insurance company wrongfully declined coverage. The amount of the coverage that was provided for in the policy was approximately $800,000. The declination of coverage was problematic because at the same time, the owner of the vessel that was on the Syncrolift at the time of the incident, MSM Charters, filed an action in the Broward County Circuit Court to liquidate the alleged claim against the Debtor. The Debtor had valid and meritorious defenses and affirmative defenses against MSM Charters based upon, among other things, the misrepresentations made by owners of the vessel as to the gross weight of the vessel. The Debtor believes that it was this misrepresentation that caused the failure of the Syncrolift and that MSM Charters has a significant liability to the Debtor. That

litigation was also being advanced by Wachs. * * * The Syncrolift litigation was recently settled. Under the settlement, the estate will receive $400,000 [for property damage]. **In addition, the subrogee of the owners vessel will receive $800,000, thereby removing substantial claim against the estate.** [Emphasis added.]

The disclosure statement also gave notice to all creditors and parties in interest as to the procedures for the treatment of disputed claims, including MSM's, as follows:

At the time of distribution to Creditors holding Ultimately Allowed Claims, including all Allowed Administrative Expenses, Allowed Priority Claims, or Allowed General Unsecured Claims, as more fully set forth in the Plan, there shall be reserved by the Debtor the amount of cash which would otherwise be distributed to the holder of such a disputed expense or Claim, as if the full amount of such expense or Claim is deemed an Allowed Claim. * * * Once a Disputed Administrative Expense, Disputed Priority Claim or Disputed General Unsecured Claim becomes an Ultimately Allowed Claim, in whole or in part, the cash reserved on account of such a disputed claim shall be distributed to such Creditor in the same proportion as other distributions to such class of creditors. [emphasis added]

MSM did not object to either of these provisions.

As a condition precedent to confirmation of the Debtor's amended plan, the Debtor

---

**2.** Under 11 U.S.C. § 1125, a chapter 11 reorganization plan proponent is required to provide disclosures to its creditors in connection with the proponent's attempts to solicit their votes in favor of the plan. The bankruptcy court is required to pass upon the adequacy

of the disclosures made prior to such solicitation, and parties in interest are entitled to object to the information contained in the disclosure statement before the court considers it.

was required to reserve the full amount of the disputed MSM claim, $987,450.78. It did so, and the full amount was escrowed prior to confirmation.

In the amended plan, the disputed MSM claim was separately classified in Class 4 of the plan. The proposed treatment of this claim was as follows:

> Pursuant to the Plan, Class 4 consists of the insured Tort Claim of MSM Charters. The Class 4 Claimant holding an Allowed Claim will be satisfied by insurance proceeds to the extent of the Debtor's coverage limits. If the Allowed Class 4 Claim exceeds the amount of the available insurance proceeds, the excess Allowed Class 4 Claim will be paid *pari passu* with the Claims of Allowed Class 3 Claimants [general unsecured claims].

After it was approved, the disclosure statement and plan were circulated to the entire creditor body, including MSM. As a result, all creditors—including MSM—were on notice that the property damage component of MSM's disputed claim had already been paid by a third party, that the $802,000 property damage claim against the Debtor had been released, and that such damages were *no longer a part* of MSM's claims against the estate, which were therefore reduced to approximately $185,000.

The release of the $802,000 property damage component of the claim was confirmed in a Mutual Specific Release (the "Release") entered into by, among others, MSM and the Debtor prior to confirmation and by its terms "effective as of March 15, 2006, without regard to the dates of execution by the Parties." The Release provides that while MSM's claim for diminution in value and consequential damages was preserved, the Release expressly released MSM's claim for property damages. I specifically approved the Release by order entered June 19, 2006 [CP 351], and all creditors and parties in interest were therefore on notice—and entitled to rely—on the reduction of MSM's claim from $987,000 to $185,000.

At no time did MSM object to the disclosure statement or to confirmation of the plan. Although it could have done so, at no time prior to confirmation did MSM file any pleading or otherwise put the Debtor, the creditors, or the court on notice that it sought to increase the amount of its consequential damages from $185,144 (consisting of lost charter profits and charter cancellation fees) to $987,450.78 (which now incorporates the Post–Repair Costs incurred by MSM after the Bradford yard completed the repairs) or the ultimate amount of $1,943,804 which MSM now claims.

I conducted a confirmation hearing on the Debtor's amended plan on July 6, 2006, and entered the Confirmation Order the next day. The Confirmation Order provided for and required the escrow of $987,450.78 for MSM's Class 4 disputed claim. Although MSM's counsel[3] was present at the confirmation hearing, MSM did not raise any issues with the amended plan, did not advise me, the Debtor, or other creditors of its intent to increase its claim to include Post–Repair Costs. In fact, MSM even voted in favor of the amended plan!

Two months after confirmation, and four months after it finally sold *Sacajawea* for $5.3 million, MSM filed an amended proof of claim (the "Amended Claim") in the amount of $1,943,804 on September 11, 2006. In the Amended Claim, MSM completely abandoned claims for property

---

**3.** MSM's counsel was actively involved in this case, represented multiple claimants in connection with it, and had full knowledge of the case.

damage and for lost charter fees and commissions. Instead, the Amended Claim asserts new theories of recovery based upon *Sacajawea's* operating expenses incurred during the 15 months after the vessel had been completely repaired and prior to its sale.

## II. Summary judgment standards

Summary judgment is provided for under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in the bankruptcy courts through Federal Rule of Bankruptcy Procedure 7056 and to contested matters in bankruptcy cases (including claims objection litigation such as this matter) through Federal Rule of Bankruptcy Procedure 9014. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rice v. Branigar Org., Inc.*, 922 F.2d 788 (11th Cir.1991); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir.1987).

In the absence of a genuine issue of material fact, a federal court should promptly adjudicate the legal questions in the case and decide them, thus avoiding the delay and expense associated with a trial. *United States v. Feinstein*, 717 F.Supp. 1552 (S.D.Fla.1989). Important as these principles are in civil litigation in the district courts, they are even more important in bankruptcy litigation, where the same policy favoring the avoidance of expense and delay generally occurs in the context of severe financial distress on the part of at least one of the parties.

A moving party may demonstrate the absence of a genuine issue of material fact in one of two ways. First, by submitting affirmative proof that negates an essential element of the nonmoving party's claims.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Second, by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* The pertinent question for me under Rule 56 is whether the evidence presented demonstrates a sufficient factual disagreement to require submission to the fact finder, or whether instead the controversy is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although MSM points to a number of purported factual disputes here, I conclude that even if all of those disputed facts are viewed in a manner most favorable to MSM, the inescapable conclusion is that the Debtor has no liability to MSM under the contract between the parties and as a matter of law. I also conclude that MSM is prohibited as a matter of law to amend its claim post-confirmation. For those reasons, I will grant summary judgment in favor of the Debtor and disallow any claim by MSM against the Debtor's estate.

## III. Legal analysis

### A. The parties' contract

The repair contract between the Debtor and MSM contains an express limitation on the Debtor's liability to MSM and an express assumption of liability for loss by MSM. Paragraph 5 of the contract provides in relevant part:

The use of the Company's facilities and services is done at the sole risk of the Owner and the Vessel, and it is expressly understood and agreed to by the Owner and the Vessel that the Company's liability under this agreement shall be limited to a breach of its contractual obligation to provide dockage space and repair services. * * * The Owner and the Vessel hereby release the company

and agrees to indemnify the Company and to hold the Company harmless from any and all liability for personal injury, loss of life and/or property damage arising out of the ordinary negligence of the Company or its employees * * *

Similarly, paragraph 6 of the contract provides in relevant part:

Under no circumstances shall the Company [the Debtor] be liable to the Owner [MSM] or to the Vessel [the *Sacajawea*] for economic loss (such as loss of use or charter), irrespective of its foreseeability, cause or resulting damage.

These two provisions, taken together, evidence a clear intent to relieve the Debtor from any liability for ordinary negligence and waives any claim by MSM for economic damages. Unless these provisions were invalid or unenforceable, they operate to bar any claim by MSM for negligence or for consequential economic losses.

### 1. Waiver of negligence

■ Under applicable federal maritime law, parties to a maritime contract may agree contractually to exculpate one of the parties from ordinary negligence. The Eleventh Circuit has adopted a three-part test by which the validity of such exculpation provisions are to be measured. *Diesel Repower v. Islander Investments, Ltd.*, 271 F.3d 1318, 1324 (11th Cir.2001). To be valid, an exculpatory provision in a maritime repair contract must provide as follows:

(a) the contract must clearly and unequivocally indicate the parties' intention;

(b) the limitation must not absolve the ship repairer of all liability and must still provide a deterrent to negligence; and

(c) the parties must have equal bargaining power when creating the agreement.

*Id.; Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*, 329 F.3d 809 (11th Cir. 2003).

■ Two of these three requirements are unquestionably present. Paragraph 5 of the contract clearly and unequivocally absolves the Debtor of any liability. Clearer language would be difficult to draft. I am similarly satisfied that the third requirement—equal bargaining power—is also present. MSM's argument that "there were only a few facilities in South Florida with equipment capable of raising the Vessel, a 130′ Hatteras, out of the water" is insufficient to create a genuine issue of material fact on this point. First, MSM obviously concedes that there were other such facilities, including the Bradford Marine yard located in Fort Lauderdale, which had previously and successfully hoisted the *Sacajawea*. A ocean-going vessel such as this is not restricted to coastal waters, and MSM could have taken it to any Gulf or South Atlantic port[4] if MSM had been unsatisfied with the Debtor's form of contract. MSM has pointed to no evidence which could support a conclusion that the Debtor's contractual limitation on liability was mirrored in any other shipyard's contracts, much less in every other shipyard's contracts, such that the absolution from ordinary negligence contained here was an industry-wide contractual provision that amounted to an adhesion contract. Finally, I note that MSM was able to purchase *One More Toy* for $17.5 million cash shortly after the incident, while the Debtor found itself compelled to seek bankruptcy protection soon thereafter. There is no question that MSM enjoyed—at the very least—an

---

4. Or, for that matter, to any port in the world.

equality of bargaining power with the Debtor.[5]

■ The only remaining question regarding the enforceability of the contractual limitation on liability under the Eleventh Circuit's standards is whether the limitation absolved the Debtor of all liability or whether it still provided a deterrent to negligence. As written, the contract only excludes liability for ordinary negligence, and the Debtor would still remain liable for gross negligence or for wanton or willful misconduct. Exculpatory language similar to that contained in the contract here was recently upheld by the District of Columbia Court of Appeals in *Carleton v. Winter*, 901 A.2d 174 (D.C.2006). *Carleton* provides a useful review of the relevant treatises, including the *Restatement (Second) of Torts* § 496B, cmt d (1963, 1964); *Corbin on Contracts* § 85.15, 455 (2003); *Williston on Contracts* § 19.23, vol. 8, 291–97 (4th ed.1998); and *Prosser and Keaton on Torts* § 68, 483–84 (5th ed.1984). As the treatises uniformly suggest, contractual exculpatory clauses absolve the exculpated party only from ordinary negligence and should not be construed to include loss or damage resulting from intentional or reckless misconduct, gross negligence, or the like. I conclude that there is nothing in the exculpation clause here that purports to exculpate the Debtor from gross negligence or worse; that there is a meaningful deterrent to such negligence which survives the application of the exculpation clause in the contract; and that the contractual provisions contained in paragraph 5 of the contract fully satisfy the prerequisites for enforceability and are consistent with the holding in *Diesel Repower, supra.*

### 2. Waiver of economic loss

The unambiguous provisions of paragraph 6 of the contract bar every damage

claim by MSM for economic loss, including consequential damages. "Loss of charter and loss of use" were expressly waived by MSM. Since the contract language is clear, I am restricted by that language in determining what damages may be recovered by MSM. *Merrill Stevens Dry Dock, supra*, 329 F.3d at 815. MSM has provided no legal justification to the contrary.

### B. Florida's economic loss rule

■ Even if the parties had not excluded economic losses and consequential damages under their contract, the Florida economic loss rule would operate to preclude any recovery by MSM for economic damages. Succinctly stated, the economic loss rule bars recovery under a tort theory where the parties are acting under a contract and economic losses are the only damages. *Indemnity Insurance Company of North America v. American Aviation, Inc.*, 891 So.2d 532, 536 (Fla.2004). The purpose of the economic loss rule, as explained by the Florida Supreme Court, is to "protect the integrity of contract," *Id.* at 537–538, or, as Justice Cantero colorfully put it in his concurring opinion in the case, to prevent contract law and warranty law from "drown[ing] in a sea of tort." *Id.* at 544.

Accordingly, even if the contract did not expressly exclude liability for ordinary negligence, no tort claims could be recovered by MSM because such claims are specifically barred by the Florida economic loss rule's prohibition on the recovery of such claims by parties who are in privity.

### C. Failure to state a claim for gross negligence

■ Prior to the filing of its Claim 27 here, MSM had sued the Debtor in state

---

5. If the scales tilt at all here, it is in the opposite direction: MSM's bargaining power would appear to have been decidedly stronger.

court. Under Florida procedural rules (which are substantially similar on this point to Fed.R.Civ.P. 8), a pleading asserting gross negligence must contain a short and plain statement of the ultimate facts showing that the plaintiff is entitled to relief. *Summerlin v. Tramill*, 290 So.2d 53 (Fla.1973) *(citing Tramill v. Summerlin*, 276 So.2d 173 (Fla.App. 3rd DCA 1973) (overturned on other grounds). Such a complaint must contain sufficient allegations of ultimate fact as to make it fairly appear that the defendant's course of conduct was of a gross, willful, and wanton character. *Id.* Allegations which might sustain a cause of action for ordinary negligence, or conclusory allegations, are insufficient. *Id.*

MSM's state court complaint is insufficient to state a cause of action for gross negligence under the foregoing standards and under Fla.R.Civ.P. 1.110(b)(2). There is no short and plain statement of the ultimate facts which would support a claim that the Debtor was grossly negligent, nor are any facts alleged from which one might reasonably conclude that the Debtor's conduct was intentional, willful, or wanton. ▮▮▮ Nor are there any pleadings or discovery materials in the record in the claims litigation here which support any contention that the Debtor was grossly negligent in its maintenance or operation of the Syncrolift. Florida substantive law defines gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Eller v. Shova*, 630 So.2d 537, 540 n. 3 (Fla.1994). As put in *Tran v. Waste Management, Inc.*, 290 F.Supp.2d 1286, 1294 (M.D.Fla.2003), a showing of gross negligence under Florida law requires the following elements:

a. Gross negligence presupposes the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than normal and ... usual ... peril;

b. Secondly, gross negligence must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of; [a]nd

c. [T]he act of omission complained of must occur in a manner which evinces a conscious disregard of consequences, as distinguished from a careless disregard thereof (as in simple negligence) or from the more extreme willful or wanton disregard thereof (as in culpable or criminal negligence).

There is simply nothing in the record here which would support a finding that the Debtor was grossly negligent or worse.

**D. MSM's damage claims were not foreseeable**

▮▮▮ Damages for breach of contract are limited to those "damages as would normally result from the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach." *Poinsettia Dairy Products, Inc. v. Wessel Co.*, 123 Fla. 120, 166 So. 306, 310 (1936). Thus, even if one were to ignore the fact that the parties contemplated and agreed in paragraph 6 of their contract that the Debtor would not be liable for any economic damages, the damages now sought by MSM could not possibly have been contemplated at the time of contracting. No reasonable person could have foreseen that MSM would take *Sacajawea* out of the charter business entirely and would instead undertake a highly limited sales campaign for fifteen months in which the vessel would be kept fully

crewed and provisioned, in readiness for a new owner to emerge. Perhaps MSM thought that it might as well try this uneconomic and apparently irrational course since it intended to stick the Debtor with the bill.[6] Regardless, the charges which MSM seeks recover from the Debtor for Post–Repair Costs are wholly unforeseeable and are therefore not recoverable under applicable Florida law.

 Under Florida law, foreseeability is analyzed in a two-step process. *McCain v. Florida Power Corporation,* 593 So.2d 500 (Fla.1992). First, the court must consider whether a defendant's conduct foreseeably created a "zone of risk" which poses a general threat of harm to others. Second, the court must consider "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id.* at 502. *McCain* treats the question of the "zone of risk" as a threshold legal requirement, and treats the causation element as a question of fact with the focus on whether "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* at 502–3. Under this test, as the likelihood of risk grows greater, so does the duty to limit and protect against the risk. However, the trial court has the discretion to consider the issue of proximate causation as a matter of law if after the event occurred and "looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." *Id.* at 504, quoting from *Restatement (Second) of Torts* § 435(2) (1965).

MSM cannot get past *McCain's* first step. The Debtor's actions did not create a larger zone of risk that posed a general threat to MSM's trade-in of *Sacajawea.* Although MSM suggests in its brief that the lifting of vessels is inherently risky, its actions (including the decision by the Master of *Sacajawea* to leave the vessel at the shipyard and fly to Europe) and the fact that vessels are regularly hoisted for survey and repair purposes belie that contention.[7] More significantly here, however, no rational person could reasonably anticipate (a) that *Sacajawea* would not continue to serve as a trade-in for MSM's purchase of *One More Toy* after it was repaired; (b) that MSM would instead enter into a contract *on the same day as the accident* to purchase *One More Toy* in an all-cash $17.5 million deal; (c) that MSM would fully crew and provision *Sacajawea* for 15 months after its complete repair while it sought to sell the vessel; or (d) that MSM would take *Sacajawea* out of charter in the interim. *Sacajawea* was fully repaired 3½ months after it was damaged. The delay in its sale, and the costs associated with the sale method chosen by MSM, cannot be attributable to any actions by the Debtor.

### E. MSM cannot recover damages for diminution in value, or "stigma damages"

As discussed in the text at footnote 1 above, the value of *Sacajawea* immediately prior to its damage was $5.5 million. The vessel was sold 15 months after repairs were completed for $5.3 million. Given normal depreciation and wear and tear, and given MSM's acknowledgment that there is great fluctuation in the market

---

6. Nothing in the record directly supports my speculation on this point, but then, nothing in the record supports any other rational explanation for MSM's behavior in this regard.

7. To the extent that MSM is suggesting a *per se* or strict liability standard be applied to the hoisting of vessels, I see no legitimate basis for such a position.

value of luxury yachts, there is no competent evidence in the record which would support a factual determination which could be made after trial that *Sacajawea* actually experienced any diminution in value after it was damaged.

 Even if such evidence existed, and MSM could establish that the value of *Sacajawea* actually declined after its damage and repair, applicable Florida law bars recovery for either the deficiency between the trade-in value and the eventual sales price or stigma damages as part of consequential damages. *Orkin Exterminating Company, Inc. v. DelGuidice,* 790 So.2d 1158 (Fla. 5th DCA 2001). The purpose of money damages is to put the injured party in as good a position as that which full performance of the contract would have put him. *Grossman Holdings Ltd. v. Hourihan,* 414 So.2d 1037 (Fla.1982). This does not guarantee or mean that the plaintiff "is to be put in the same specific physical position," *Id.* at 1039. When a plaintiff can be made whole by repairing the damage or receiving compensation equal to the cost of repair, the law does not generally allow an additional recovery for any diminution in value which occurs beyond the cost of repair. *Id.*

MSM has acknowledged that *Sacajawea* was fully repaired. It nonetheless contends that the damages to the vessel created a "stigma" which resulted in the refusal by the owner of *One More Toy* to accept *Sacajawea* as a trade-in,[8] which in turn caused MSM to incur the extraordinary and unforeseeable expenses it now seeks to recover from the Debtor. This type of damage cannot be recovered under Florida law

## F. MSM failed to mitigate its damages

 As a general proposition, a plaintiff must take all reasonable steps necessary to avoid further damages, and whether the plaintiff undertook to mitigate damages is relevant to the damage calculation. "[D]amages which the plaintiff might have avoided with reasonable effort . . . are . . . not caused by the defendant's wrong . . . and, therefore, are not to be charged against him." 2 *Williston on Contracts* § 1353 at 274 (1962). MSM failed to take reasonable steps to mitigate its damages. From the completion of repairs in February 2005 through the sale of *Sacajawea* in May 2006, MSM made no attempt to charter the vessel, other than one four-night charter in October 2005. That charter generated $16,850 in revenue. During that same period, MSM generated $4.5 million in charter revenue from its operation of *One More Toy.* Despite MSM's conscious decision to use *One More Toy* to generate very substantial revenues while holding *Sacajawea* back from the charter business, MSM wants to Debtor to pay all of its expenses associated with keeping *Sacajawea* fully crewed and provisioned, including both ordinary and extraordinary expenses—none of which relate in any way to the Syncrolift failure and the damage to the vessel, but all of which could have been offset by the continued use of *Sacajawea* as a charter vessel until its sale. MSM's decision to pull *Sacajawea* out of the charter business and its decision to keep the vessel fully crewed and provisioned constituted a flagrant failure to mitigate its damages. As a consequence, even if such damages were not contractually barred, and not barred as a matter of law because they were unfore-

---

8. This assertion is of somewhat dubious validity, given that MSM agreed to a $17.5 million all cash deal on the same day that the damage occurred.

seeable, they are barred because MSM failed to mitigate.

### G. MSM would not be permitted to amend its proof of claim had it sought to do so pre-confirmation

MSM's original proof of claim was filed in the amount of $987,450.78, and consisted of approximately $ 802,000 in property damages and $185,000 in consequential damages. The property damage claim for $802,000 was released by MSM after the insurance companies paid for the repairs to *Sacajawea*. As noted in the background discussion above, the record was full of references to the nature and extent of MSM's claim. In the run up to confirmation of the Debtor's chapter 11 plan, the record—as set forth in the claim itself, the release of the property damage claim, the disclosure statement, and the plan—was clear that the only real, live claim against the Debtor from MSM was the disputed $185,000 consequential damage claim arising entirely from lost charter income and commissions [9] (although, to be sure, the Debtor reserved and escrowed cash to satisfy the entire $987,000 claim as filed). MSM did absolutely nothing to disabuse the Debtor, the other creditors, or the court from the reasonable conclusion that the only real fight left in the case was the Debtor's objection to MSM's $185,000 consequential damage claim. Instead, MSM sat quietly by, did not object to the disclosure statement or plan, and even voted for the plan.

It is particularly noteworthy that MSM sold *Sacajawea* in early May 2006, about two months prior to the confirmation hearing. Although its accounting may not have

been complete,[10] MSM most certainly knew prior to approval of the disclosure statement and prior to confirmation that the claim for consequential damages it intended to assert was far greater than the $185,000 it had included in its filed claim. In fact, MSM's ultimate consequential damage claim is *more than ten times* the consequential damages it let the Debtor, the creditors, and the court know about prior to confirmation, and arises from entirely different categories of expenses than those asserted in the (now abandoned) $185,000 claim for lost charter fees and commissions.

On September 11, 2006, four months after the sale of *Sacajawea* and two months after confirmation, MSM filed its Amended Claim in the amount of $1,943,804. All of that claim constitutes consequential damages, and fills up both the $802,000 in property damages included in the Initial Claim and another $956,000 besides.

If the Amended Claim had been filed before confirmation, even though a year or so after the bar date,[11] at least the Debtor, creditors, and the court would have had some inkling that MSM intended to assert a consequential damage claim 1000% greater than anything it had previously asserted. The information was clearly and uniquely in MSM's possession. MSM's failure to disclose its new claim operated to the severe prejudice and detriment of the Debtor and of other creditors.

 Amendments to claims are generally allowed where the purpose is to cure a defect in the original claim, to de-

---

9. These categories of damages have been entirely abandoned in MSM's Amended Claim which seeks recovery for the carrying costs discussed above.

10. Organizing all of the invoices for rental cars, boat shoes, flowers, bar bills and the like is, after all, time consuming.

11. As noted above, the bar date for the filing of claims was fixed by order at July 11, 2005.

scribe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. *In re International Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir.1985); *In re Integrated Resources, Inc.*, 157 B.R. 66, 70 (S.D.N.Y.1993). Post-bar date amendments must be reviewed with careful scrutiny to assure that there is no attempt made to file a new claim under the guise of an amendment. *In re Enron Corp.*, 419 F.3d 115 (2nd Cir.2005). Here, MSM's post-bar date, post-confirmation amendment did not arise out of the same "conduct, transaction, or occurrence" as set forth in the original claim. Rather, it includes a whole panoply of damages arising out of it unilateral decisions to pull *Sacajawea* out of the charter fleet but to keep the vessel fully stocked and provisioned nonetheless.

In *Enron*, the Second Circuit explained the process and analysis which a bankruptcy court should employ in determining whether an amendment to a proof of claim should be allowed, as follows:

Courts considering amendments to claims typically engage in a two-step inquiry: First, they examine " 'whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.' " *Id.* (quoting *In re Black & Geddes, Inc.*, 58 B.R. 547, 553 (S.D.N.Y.1983)). An amendment will meet this threshold of it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990)(citing *In re G.L. Miller & Co.*, 45 F.2d 115, 116 (2d Cir. 1930)). Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will "examine each fact within the case and determine if it would

be equitable to allow the amendment." *In re Integrated Res., Inc.*, 157 B.R. at 70. Multiple factors play a role in the analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would "receive a windfall" from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified. *See, id.; see also In re McLean Indus., Inc.*, 121 B.R. at 708. Of these, however, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *In re Integrated Res., Inc.*, 157 B.R. at 70.

*Id.* at 133.

The *Enron* analysis provides detailed and generally accepted instruction on how the bankruptcy court should view post-bar date amendments filed *before* confirmation of a chapter 11 plan. Under the *Enron* standard, MSM would not have been allowed to amend its Claim even prior to confirmation. Case law mandates a significantly higher degree of scrutiny when a claimant seeks to amend its claim *after* confirmation.

**H. Post-confirmation amendment of MSM's proof of claim patently improper**

Confirmation of a chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation, and a post-confirmation amendment of a claim should only be allowed for compelling reasons. *In re Chappell*, 984 F.2d 775 (7th Cir.1993); *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1354 (7th Cir. 1990). It would be inequitable and highly prejudicial to the Debtor and its legitimate creditors if MSM were allowed to revise or amend its proof of claim in an attempt to increase the amount and type of its dam-

ages. *Holstein v. Brill,* 987 F.2d 1268 (7th Cir.1993).

### 1. Waiver

First, MSM has waived any right to amend its claim. Waiver, generally characterized as "the intentional relinquishment of a known right," *Dooley v. Weil,* 672 F.2d 1340 (11th Cir.1982), requires (1) the existence at the time of waiver of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. *Id.* at 1347.

Here, MSM voluntarily participated in the disclosure statement approval process and the plan confirmation process—and voted in favor of the plan—without once mentioning that it intended to assert an amended claim which had fully matured and been fully liquidated upon the sale of *Sacajawea* two months before the confirmation hearing. Until it filed its amended claim in September 2006, MSM gave no inkling to creditors or the court [12] that its claim was anything more than $802,000 in property damage, the entire amount of which had been paid by insurance, and $185,000 in consequential damages. MSM never sought to amend its claim, never sought amendment of the Debtor's disclosure statement, never sought to stay confirmation, and never objected to its treatment under the plan. Here is what MSM did do:

(1) On May 10, 2006, MSM closed on the sale of *Sacajawea* for $5.3 million.

(2) On May 30, 2006, MSM filed its response [CP 291] to the Debtor's objection to MSM's original claim. In the response, MSM represented to the court that it "timely filed a claim in the amount of $987,450.78 together with a summary outlining the different components of the claim amount.... The amounts due to Claimant arise from prepetition damages sustained to the vessel '*M/V Sacajawea*' as a result of the collapse of the Syncrolift and lost charter fees and commissions [13] which had to be paid despite the fact that the vessel was not able to meet its charter obligations due to the accident."

(3) On May 31, 2006, MSM filed a motion [CP 298] which sought the estimation or temporary allowance of its Claim 27 [14] under Fed.R.Bankr.P. 3018(a) for purposes of voting on the Debtor's chapter 11 plan, objecting to the plan, and determining whether the plan is feasible.[15] The motion notes that the claim was timely filed in the amount of $987,450.78.

---

**12.** MSM did give the Debtor's counsel a copy of its "Damage book" in August, a month after confirmation and a month before it filed the Amended Claim.

**13.** As noted above, MSM's Amended Claim entirely abandons charter fees and commissions as elements of its damage calculation.

**14.** A claim to which an objection has been made is not entitled to vote on the reorganization plan unless the claimant seeks and obtains an order estimating or temporarily allowing the claim for voting purposes. The purpose of the rule is to prevent either specious claims or specious objections from interfering with honest creditor democracy in the plan voting process.

**15.** Under 11 U.S.C. § 1129(a)(11), the bankruptcy court must find before it confirms a chapter 11 plan that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This requirement is generally referred to as the "feasibility test."

(4) On June 14, 2006, MSM filed its Ballot [CP 328] accepting the Debtor's plan, and indicated on the ballot that MSM held a Class 3 general unsecured claim in the amount of $987,450.78, "subject to Court's ruling on Motion for Estimation" [CP 298]. On June 28, 2006, following a hearing on June 26th, and without objection from MSM, I entered an order [CP371] denying as moot MSM's motion for estimation [CP 298].

In none of these pleadings filed in anticipation of the confirmation hearing on July 6th did MSM give any hint that it intended to assert its huge Amended Claim made up from entirely new categories of damages. MSM's waiver of its right to do so two months later is implied from its actual conduct. *Dooley, supra,* 672 F.2d at 1347. The acts, conduct and circumstances surrounding MSM's Claim were relied upon by creditors of the estate and by me in concluding that the Debtor's plan was feasible under § 1129(a)(11). All parties in the courtroom—and I—knew that MSM had released the $802,000 property damage component of its Claim after the settlement was approved and the insurance proceeds paid. MSM had expressly released the Debtor from any property damage claim. MSM had sold *Sacajawea* two months before the confirmation hearing, and surely knew then—but kept hidden from creditors and me—that it intended to assert a consequential damage claim **more than ten times greater** than the $185,000 consequential damage claim that the Debtor, all other creditors, and I knew was still out there. The Debtor, its creditors, and the court were entitled to rely on MSM's silence during the confirmation process to conclude that the maximum exposure which the estate had to MSM was $185,000. MSM's failure to timely amend its claim after the sale of *Sacajawea* and its failure to object to the disclosure statement and to confirmation of the plan constitute as a matter of law a knowing waiver by MSM of its right to amend its proof of claim at a later date.

## 2. Estoppel

In addition to being barred from claim amendment by its waiver, MSM is also estopped from amending its claim. The Debtor and its creditors, and I, relied upon MSM's actual and implied representations as to the nature and amount of its claim. All of the rest of us present in the courtroom at the confirmation hearing "knew" that MSM's $987,000 claim had been reduced as a result of MSM's release of the entire $802,000 property damage portion of that claim. We all knew that MSM's total remaining damage claim was no greater than $185,144, arising solely from lost charter revenues and charter cancellation fees. The Debtor relied upon this knowledge in proposing the plan; other creditors relied upon it in determining whether to vote in favor of the plan; and I relied upon it in determining that the plan was feasible.

Subsequent to confirmation, and again in reliance on the knowledge described above, the Debtor substantially consummated the plan pursuant to § 1101(2) by, among other things, distributing initial dividends to creditors holding allowed claims. *See Holstein, supra,* 987 F.2d 1268. Now, with the specter of MSM's Amended Claim hanging over the case, the Debtor would have to seek the return of plan distributions from the legitimate creditors who have been paid in order to have enough money to make a *pro rata* distribution to MSM on its $1,943,804 Amended Claim. This exercise would be highly prejudicial to those legitimate creditors, would multiply litigation enormously, and would call into question fundamental issues of fairness and due process.

The absurd spectacle which would result from the allowance of MSM's late-filed Amended Claim could have been entirely avoided had MSM properly and timely amended its claim instead of waiting four months after the sale of *Sacajawea* and two months after confirmation to do so. MSM most surely knew well before it sold *Sacajawea* in May 2006 that it had accumulated huge consequential damages during the fifteen months since the repairs had been completed in February 2005. Instead of letting the Debtor, creditors, and the court know that these huge new claims existed, MSM lulled all of us into assuming that the plan would pay legitimate creditors what it said it would pay them, and that the plan was feasible. The creditors, the Debtor, and I relied on the representations implicit in MSM's silence. MSM is estopped now to change those representations through the assertion of its Amended Claim.

### 3. *Res judicata*

A creditor's treatment under a confirmed plan of reorganization creates a contractual relationship between the debtor and the creditor. The creditor's pre-confirmation claim is subsumed in and replaced by the new contract created by the confirmed plan; "each claimant gets a 'new' claim, based on whatever treatment is accorded to it in the plan itself." *Holstein, supra,* 987 F.2d at 1270; *In re Benjamin Coal Co.,* 978 F.2d 823, 827 (3rd Cir.1992). The initial claim filed by the creditor during the pendency of the case is dead, replaced by the new contractual obligation created by the creditor's treatment under the confirmed plan.

The doctrine of *res judicata* in bankruptcy proceedings "not only bars a court from relitigating issues that have been litigated in a cause but also bars a court from litigating issues that *may have been litigated.*" *In re Westbrook,* 246 B.R.

412, 416 (Bankr.S.D.Ala.1999). MSM had every opportunity to amend its claim and litigate its entitlement to the new consequential damages it seeks at or before the confirmation hearing. *In re Justice Oaks II, Ltd.,* 898 F.2d 1544 (11th Cir.1990). It did not do so, and its attempt to amend its claim two months after confirmation is barred by *res judicata.* Pursuant to MSM's release of the $802,000 property damage claim, MSM's maximum claim is limited by the *res judicata* effect of the confirmation order to $185,144, the balance of its original claim.

### IV. Conclusion

MSM is barred from amending its Claim post-confirmation under principles of waiver, estoppel, and *res judicata.* Since MSM released the $802,306.78 property damage component of its initial claim of $987,450.78, only the balance of its Initial Claim, $185,144, is properly before me for consideration. The parties' ship repair contract, entered into between parties of equal bargaining power, expressly bars the types of damages sought by MSM in the $185,144 portion of its initial claim (and also bars in their entirety the $1,943,804 in new categories of consequential damages sought in the Amended Claim). The contract clearly and unequivocally waives the claims asserted by MSM but does not absolve the Debtor of liability for gross negligence, willful misconduct, or the like, and the contract is thus enforceable under maritime law. "Loss of charter and loss of use" damages were expressly waived by MSM, and would in any event be barred under the economic loss rule provided for in applicable Florida law. MSM failed to state a cause of action in its state court complaint, and has failed to state a claim here, for gross negligence. Moreover, its damage claims were not reasonably foreseeable by the parties at the time of con-

tracting. Losses for diminution in value, or "stigma damages," are unavailable as a matter of law. Finally, MSM failed utterly to mitigate its damages as it was obliged to do.

There is no genuine issue of material fact present in this case, the Debtor is entitled to judgment as a matter of law, and the Initial Claim and the Amended Claim filed by MSM, Inc., f/k/a MSM Charters, LLC, are hereby DISALLOWED in their entirety.

## V. Attorneys' fees and costs

The ship repair contract between the Debtor and MSM provides for the award of attorneys' fees under certain circumstances. The Debtor is hereby authorized to file a motion seeking the allowance of attorneys' fees and costs associated with its objection to MSM's claim within twenty days of the date of this order. That motion, and any timely objection filed by MSM, will be considered at a hearing to be held on **January 24, 2007, at 1:30 p.m.**

## VI. Order to show cause

Pursuant to the provisions of Federal Rule of Bankruptcy Procedure 9011(b), MSM and its counsel have represented to the court that the claims and other legal contentions made in its Amended Claim and in the pleadings and briefs filed in connection therewith are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. MSM's assertion and prosecution of its Amended Claim subsequent to confirmation of the Debtor's plan and in the context of MSM's own pre-confirmation behavior appears to be (a) wholly frivolous and abusive under existing law, and (b) barred under clear and well-established doctrines of waiver, estoppel and *res judicata* which are, or should be, entirely familiar to experienced bankruptcy practitioners such as MSM's counsel. Ac-

cordingly, and pursuant to Rule 9011(c)(1)(B), MSM's counsel Robert D. McIntosh and Mariaelena Gayo–Guitian, and the law firm of Adorno & Yoss LLP, are hereby ORDERED to show cause why they have not violated Rule 9011(b) with respect to the post-confirmation filing and prosecution of MSM's Amended Claim, in a hearing to be held in Courtroom 308, United States Courthouse, 299 E. Broward Boulevard, Fort Lauderdale, FL 33301 on **January 24, 2007 at 1:30 p.m.**