In re ROBBY'S PANCAKE HOUSE OF FLORIDA, INC., Debtor.

ROBBY'S PANCAKE HOUSE OF FLORIDA, INC., Plaintiff,

v.

William C. MARTIN, Defendant.

Bankruptcy No. 3–81–01326.

Adv. No. 3–81–0919.

United States Bankruptcy Court, E. D. Tennessee.

June 14, 1982.

Kramer, Johnson, Rayson, McVeigh & Leake, Erma G. Greenwood, Knoxville, Tenn., for plaintiff.

Kennerly, Montgomery, Howard & Finley, Jack M. Tallent, II, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff, Robby's Pancake House of Florida, Inc., seeks to recover damages from the defendant, William C. Martin, an architect, resulting from alleged negligence in the performance of professional architectural services for a building constructed in Knoxville, Tennessee, and designed for use as a restaurant.

Plaintiff asserts that the defendant Martin was guilty of negligence which proximately caused the foundation of the northwest corner of the building to fail, necessitating the removal of the walls; further, that the defendant was guilty of negligence which caused the oak paneling on the interior walls to buckle and pull away from the wall, necessitating the expenditure of monies to repair the paneling. Specifically, plaintiff says that defendant's negligence consisted of failing to have a soils investigation prepared before construction commenced on the site; that defendant failed to specify vapor barriers in the walls between the block and interior finish; and that defendant did not use the degree of professional care and diligence required in supervising construction or dealing with problems which arose during construction.

The defendant Martin insists that he had no duty, or fulfilled any duty he had, (a) because the president of Robby's, Robert Smith, advised him that the site was "good compacted fill and ready to build," and (b) vapor barriers are not customarily installed in similiarly constructed buildings in this area. Martin further says that Robby's assumed the risk of unsatisfactory site and surface conditions as its agents and officers were aware of the unsatisfactory fill and did not advise Martin of that fact.

## I

In the fall of 1976, Robby's Pancake House of Florida, Inc. (Robby's), planned to open a restaurant in Knoxville, Tennessee. The building that Robby's desired to build was to conform as nearly as possible to a Robby's Pancake House located in Clearwater, Florida. Robert Smith, president of Robby's, obtained a set of plans of the Clearwater building.

Robby's officers or agents selected a site at 8807 Kingston Pike, Knoxville, Tennessee, a filled lot, on which the restaurant building would be constructed. Defendant, William C. Martin, was employed to furnish architectural services. Martin was furnished a set of plans of the Clearwater building with the understanding that the Kingston Pike building would be constructed to conform as nearly as possible to those plans.[1] Martin was to make such revisions and modifications of the plans as were required by the differences in the sites, and building codes in effect in Clearwater, Florida, and Knoxville, Tennessee. In addition, Martin was to perform architectural services except for air conditioning, electrical, plumbing and kitchen design work, and the certification of progress payments. For his services, Martin was to be paid a fee of two percent (2%) of the costs of construction.[2]

After negotiating with and receiving bids from several contractors, based upon the Florida plans, Robert K. Walker was selected as the general contractor for construction. Walker was to be paid cost plus ten percent not to exceed $162,500. Construction commenced during the first week in February, 1977.

The site upon which the building was to be erected was basically level but not as high as Kingston Pike. It had been filled some years previous. Robby's president, Smith, insisted that the building be constructed on a "knoll," two feet higher than the road level. This required further filling, which was accomplished.

Footings were dug on the site and poured in concrete to give support for the building. The block wall was built on the footings. However, after the block wall was laid and the stone was being put on the exterior of the blocks, a crack developed in the rear wall of the building. The architect was notified and made a visit to the site. He advised the contractor to continue construction but to watch the crack. The crack progressively widened over a one to two week period to approximately three inches. It was then determined that the source of the problem had to be identified. The architect attempted to reach several testing labs but they could not immediately conduct an investigation. Geologic Associates of Knoxville was contacted and was able to begin an immediate investigation. Excavation of the site revealed a poorly compacted fill. The fill material was also found to contain debris of an organic and nonorganic nature. As a result of the soils investigation, a portion of the back wall of the building was pulled down and the footings torn out. The contractor proposed a solution which was accepted by the architect and the soils testing firm, Geologic Associates. This solution consisted of the placement of sonotubes (large cardboard tubes 12 feet high and 12 inches in diameter) into the excavated trench in the area under the footings for the building. These sonotubes were then filled with concrete in order to establish continuous columns or caissons under the affected portions of the building. The building footings were then reconstructed on top of the caissons or pylons. The back wall was then rebuilt. The additional cost for labor and materials to correct the back wall defect was $12,173.38.[3]

---

1. There is some testimony in the record that Smith requested Martin to "stamp" these plans but that he refused to do so.

2. The prevailing charge in the community in 1976–1977 for a full service contract for architectural services ranged from 4½–6 percent.

3. This figure represents the total of invoices delivered by plaintiff to the defendant. At trial plaintiff stated that this figure should be increased to $16,390.83 as all invoices had not been submitted to the defendant. In view of the court's holding, it is unnecessary to determine the specific cost of the repairs.

In 1981, after the building was in use as a restaurant, some paneling buckled or popped away from the walls of the building which was ultimately repaired at a cost of some $3,200.00.

The crux of Robby's complaint is that Martin failed to have a soils investigation report prepared before construction commenced on the site. Martin replies that Robby's assumed the risk of unsatisfactory site and surface conditions.

When Smith initially employed Walker as the building contractor, Walker advised Smith that the construction price would depend upon the necessary depths or pylons since he anticipated there would be soil problems because of past difficulties he had encountered in constructing a building on an adjacent site. Smith replied there was nothing wrong with the soil—that he had tried to place a sign in the ground but had encountered difficulty in doing so.

Allen Ferguson, a real estate developer in the Knoxville area with offices adjacent to Robby's, observed that construction of the building was beginning and went to Smith and advised him of a soil problem, offering him a copy of a soils report which had been obtained on Ferguson's property. Ferguson told Smith he ought to get a soil check, that the soil would not hold because of the depth of the fill and because the fill had not been compacted. Smith told Ferguson to get off his property, that he was going to do as he —— —— pleased.

Smith was on the site continually and in essence took over the function of the contractor. The trial court and the Court of Appeals, Eastern Division, sitting at Knoxville, made a similar finding in a lawsuit involving Walker and Robby's.[4] Exhibit 21. Immediately upon commencement of construction Smith involved himself in directing the contractor's laborers. When the grading contractor brought the site to grade (as shown on the architect's plans) and left the site, Smith came onto the site and, without consulting the architect, or-

dered the contractor to recall the grading subcontractor and add an additional foot of fill material to the building site. Smith also changed the exterior finish from standard-sized brick to a block of a different size. Additionally, Smith changed the interior finish from paneling to oak. Smith's actions were taken without consultation with the architect Martin as to any effect the changes might have on the building. Some of Smith's actions resulted in construction problems. Smith also contracted with and supervised several subcontractors, including the plumbing and electrical subcontractors.

Smith's testimony regarding discussions with Martin concerning soil conditions at the site is contradictory. At trial, Smith testified that he knew nothing about the soil conditions; that when Martin asked him if he knew anything about the soil or site conditions he answered "no;" that he never told Martin the site was ready to build on. In a previous deposition, however, Smith testified that he "could have told Martin" that the site was ready to build on. At another point, he conceded he told Walker that the soil was "alright," and that he had tried to put up a sign and found the soil was "hard." Smith also testified that Martin had asked him (and Walker) to find out about the soil and that he told him he would do so. Smith also conceded he had talked to Alan Ferguson and that he had received a copy of the soils report from him.

Smith at no time advised Martin of his conversations with Ferguson and Walker about problems with the soil on the adjacent site which also consisted of fill material that had been placed at the same time.

It is thus apparent from the totality of the testimony that Smith in many instances acted in an arbitrary and dictatorial manner, overriding the decisions of the very persons he had employed to design and construct the building. These decisions materially affected the construction of the build-

4. In this action Walker sought an alleged balance owing for materials and labor expended under the construction contract. Robby's de-

nied the indebtedness and filed a cross-action for damages, alleging Walker's failure to construct the building in a workmanlike manner.

ing and adequately foretold the spate of lawsuits that followed.

## II

Only those persons duly licensed may practice architecture in Tennessee. T.C.A. § 62–2–101, et seq. Defendant Martin was so licensed. T.C.A. § 62–2–101 reads as follows:

"In order to safeguard life, health and property, and to promote public welfare, by requiring that only properly qualified persons shall practice architecture and engineering in this state, any person practicing architecture or engineering shall be registered as hereinafter provided, and it shall be unlawful for any person to practice or offer to practice architecture or engineering unless such person has been duly registered under the provisions of this chapter, except as hereinafter provided." [5]

T.C.A. § 62–2–101 is a police measure enacted for the protection of public safety and health—

"The statute requiring person practicing architecture to be registered by State Board of Architecture is not a revenue measure, but a police measure, enacted for protection of public safety and health, and hence applies to person engaging in single isolated architectural transaction, as well as person practicing architecture as business or profession." *Cantrell v. Perkins*, 177 Tenn. 47, 146 S.W.2d 134 (1941).

In *State Board of Examiners v. Rodgers*, 167 Tenn. 374, 69 S.W.2d 1093 (1934), it was held that even the business of drawing plans and specifications for dwelling houses involves the public safety and health. In that case the court said:

"In the construction of such buildings, it is contemplated that members of the public will enter and use them, as owner, guest, invitee, or licensee, for business purposes or those of pleasure, and for varying periods of time. The safety of all such persons may be involved in the sound and stable construction of the building. The proper ventilation and sanitation of buildings involves the health of all who use them as habitations. Therefore one who offers himself to the public to design, plan, and superintend the construction of buildings is engaged in a business which involves the public safety and health, notwithstanding his business is limited to the designing and construction of buildings intended to be used as private dwellings."

■ Thus, in Tennessee, it is abundantly clear that an architect is charged with a statutory duty to exercise superior knowledge and abilities so as to insure the sound and stable construction of the building.

## III

■ In the court's opinion, the narrow issue upon which this case turns depends upon whether Martin was justified in relying upon Smith's representations that the site was ready to build on. Limiting the court's decision to the facts of this case, and the fact that the controversy is between only the plaintiff and the architect, the court concludes that the plaintiff has failed to carry the burden of proof that the architect negligently breached his contract when he failed to ascertain the subsoil conditions of the site upon which the building was to be erected. In the court's opinion, plaintiff by its words, acts, and conduct assumed the risk of unsatisfactory site and subsurface conditions and is now estopped from complaining that the fault was that of Martin.

■ Estoppel is an equitable doctrine which prevents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position. Estoppel requires (1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated. *Matter of Garfinkle*, 672 F.2d 1340, 1346,

**5.** The exemptions in T.C.A. § 62–2–101 have no application to the facts in the instant case.

(5th Cir. 1982). See generally 28 Am. Jur.2d, Sec. 34, p. 638; *Lawrence County v. White*, 200 Tenn. 1, 288 S.W.2d 735, (1956).

The decision under the unusual facts in this case, however, in no way adopts defendant's position that "if an owner advised an architect that a site consisted of good compacted fill and was ready to build and the site appeared as the owner represented" that the "customary and proper architectural practices prevailing in the area in 1976 and 1977 would not require the architect to require a soil investigation." See defendant's proposed finding No. 34. See *Rural Educational Association v. Bush*, 42 Tenn. App. 34, 298 S.W.2d 761 (1956), a medical malpractice suit, wherein an exception was noted to the general requirement that malpractice actions involving issues of negligence and proximate cause require expert testimony. T.C.A. § 62–2–101 is a police measure enacted for the protection of public health and safety. See *State Board of Examiners v. Rodgers, supra.* Fortunately, no one was injured by the failure to initially construct the building upon a firm foundation.

Nor does the court agree that plaintiff's charge of negligence in this case, if sustained, would create a new standard of review for all professionals and make the practice of law, medicine, architecture, and engineering one of "Russian roulette." Defendant's Memorandum, p. 4.

The court's determination as to plaintiff's failing to carry its burden of proof as to the site and subsurface allegations applies also to plaintiff's claim for damages resulting from interior panel buckling or "popping away" from the walls. Again, Smith, without notice to Martin, changed the interior paneling from pine to oak. Nor has plaintiff shown by a preponderance of the evidence that it was a customary or architectural practice in this area in 1976–1977 to install a vapor barrier in the walls of buildings of similar construction, if, in fact, that was the cause of the problem.

Plaintiff's claim for damages will be denied. Defendant will recover from the plaintiff the agreed architectural fee.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

Submit judgment within five days.