FILED
12/21/2023
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 22, 2023 Session

**JETTON DEVELOPMENTS, LLC v. ESTATE OF DOROTHY
HUDDLESTON ET AL.**

**Appeal from the Chancery Court for Sumner County
No. 2021CV-97      Louis W. Oliver, Chancellor**

_____

**No. M2023-00026-COA-R3-CV**

_____

A limited liability company filed suit in relation to a piece of real property for which the company had executed an agreement to purchase. Although closing did not occur by the time stated in the executed agreement, the trial court ultimately held that the opposing side in this case was estopped from denying that the contract had been extended. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Beth A. Garrison, Hendersonville, Tennessee, for the appellants, The John S. and Dorothy O. Huddleston Revocable Living Trust, The Estate of Dorothy Huddleston, Roger Huddleston, Claudia Neely, and Janice Knox.

Joseph B. Freedle, Gallatin, Tennessee, for the appellee, Jetton Developments, LLC.

**OPINION**

**BACKGROUND**

This appeal arises from a real estate contract executed by Dorothy Huddleston ("Mrs. Huddleston") and Jetton Developments, LLC ("Jetton"). Although the property at issue was actually in a revocable living trust and not formally owned by Mrs. Huddleston at the time the contract with Jetton was executed, we note that the trial court made a determination during the pendency of this case that Mrs. Huddleston, a trustee of the trust,

had the power to bind the trust, holding specifically as follows on the matter: "The purchase and sale agreement was validly entered into by Mrs. Huddleston as sole Settlor, sole Trustee, and sole Beneficiary [and she] had the power to sign the contract, and bind herself and the Trust." There does not appear to be any dispute on appeal regarding the propriety of this ruling; instead, the controversy before us concerns Jetton's efforts to acquire the subject property notwithstanding the fact that closing did not occur on or before the stated closing date in the contract. With that in mind, our overview of the facts of this case will be focused on that matter and the events that occurred subsequent to the written contract's execution.[1]

Under the contract, which, among other things, provided that it was "for the benefit of, and . . .binding upon, the parties hereto, their heirs, successors, legal representatives and assigns," the listed closing date was May 3, 2021. In advance of that date, on April 8, 2021, Chad Wilson, the seller's agent, was contacted by someone from Jetton who wanted to inquire whether Mrs. Huddleston would extend the closing date. According to Mr. Wilson, Jetton was "comfortable" to close on the date in the contract but nonetheless "would really like to have an extension." Mr. Wilson contacted Mrs. Huddleston by phone the same day to pose the question of an extension to her, and per his testimony, Roger Huddleston,[2] who was Mrs. Huddleston's son, "was in the background" on the call.[3] According to Mr. Wilson, Mrs. Huddleston agreed to a thirty-day extension He further testified that Roger had stated that an extension would be a good idea. Jetton was informed on the same date that Mrs. Huddleston had agreed to an extension.

Although a member of Jetton thereafter prepared a written document memorializing an extension of the closing date, digitally signed that document, and emailed it to Mr. Wilson, Mr. Wilson did not locate the document until about a week later when he checked his spam folder. Mr. Wilson then reached out to Mrs. Huddleston in an effort to get her to sign the extension paperwork Jetton had prepared, but by the time he got in touch with her, he had become exposed to COVID. Discussing this in his testimony, Mr. Wilson explained as follows:

> And the next time I tried to call her I had found out that I had been exposed to COVID, and I called to tell her that. And I said as soon as I . . . get out of my quarantine because I don't want to take a chance. COVID had run through our office, so I didn't want to take a chance on her just going up

---

[1] Given that focus, we dispense with an overview regarding the procedural filings that precipitated the trial court's ruling that Mrs. Huddleston had the power to sign the contract in this case and bind the trust.

[2] Herein, we will refer to Mr. Huddleston as Roger for ease of reference and to provide a clear contrast from the references made to Mrs. Huddleston. We intend no disrespect.

[3] Roger claimed that he was in another room during the call and did not hear the conversation. He testified that his mother told him that Mr. Wilson wanted her to sign an extension; he further testified that his mother did not tell him that she had agreed to an extension.

to the office and signing it.

> By the time that that was over with, I had called a couple times and missed her, back and forth. I finally got a hold of her, and I was busy that day and I said I will call you back later on in the week and we will meet and sign. And she said okay.

The extension paperwork was never formally signed by Mrs. Huddleston, however, as she died at Roger's home in Indiana on April 30, 2021. According to Roger, he and his mother had only been there for a few days when she passed. At the oral argument of this matter, counsel for Roger stated that Mrs. Huddleston's actions did not indicate that she was preparing to come back for a May 3 closing date.

As we mentioned earlier, the contract provided that it was "binding upon . . . the parties hereto, their heirs, successors, legal representatives and assigns," and of note, Roger was the successor trustee of the trust that held the subject property. Subsequent to his mother's death, Roger represented that he was going to honor the contract, with Mr. Wilson testifying that Roger had called him on the date of Mrs. Huddleston's passing and discussed the subject of selling the property. Mr. Wilson also testified that he had spoken with Roger again "at some point after that." Then, "maybe a month later" according to Mr. Wilson, Roger had informed him that he no longer wanted to sell the property.

According to Roger, he did not call Mr. Wilson on the date of his mother's death, but he did acknowledge that he had communicated his intention to follow through with the contract. He even confirmed that he had done so subsequent to the May 3, 2021, closing date that was originally scheduled in the written contract. He specifically asserted that he had called Mr. Wilson on May 10, 2021, and communicated his intention at that time to follow through with the contract. He further testified that he was aware that Jetton was working on permits and taking steps to pursue closing. With respect to that concern, evidence was introduced at the trial regarding substantial expenses Jetton incurred under the expectation that the contract would be closed. As will be discussed later in this Opinion, the trial court would ultimately find that Jetton had continued to work on issues for the development of the property after Mrs. Huddleston's death and had spent thousands of dollars post-May 3. Members of Jetton testified that they had labored with the understanding that an extension was in place, and again, Roger testified that he was aware that Jetton was continuing to pursue efforts towards closing as of May 10, 2021, the date he claims he expressed his intent to follow through with the contract. A closing never happened, however, as Roger then later communicated that he would not honor the contract. This, of course, prompted the present litigation pursuant to which Jetton has sought, among other things, specific performance of the contract.[4]

---

[4]Regarding the litigation that manifested, the record admits of some initial oversight regarding the fact that the subject property was held in a trust. In the initial complaint filed by Jetton, Jetton's caption

- 3 -

Following the conclusion of the proof in this case, the trial court made several statements from the bench, including expressing its opinion that certain contract contingencies were "buyer's stipulations" and that "the buyer would have the right to waive those." The "main issue" that the trial court remained concerned with, it noted, was "this extension of the contract." The trial court discussed at length the various questions and concerns that would potentially inform the issue of whether there was a valid extension, and after inviting the parties to submit proposed findings of fact and conclusions of law, the court took the case under advisement.

When the trial court thereafter entered its "Findings of Fact, Conclusions of Law and Judgment," it decided the case in favor of Jetton. Among other findings, the trial court found that Mrs. Huddleston had agreed to extend the contract closing date, that Roger was aware she had agreed to an extension, and that Roger had provided assurances about proceeding with the contract after her death. As to the last of these points, the trial court noted that, even though Roger denied calling Mr. Wilson on the day of his mother's death, "he admitted he later called Wilson and asserted that he still wanted to close the sale and that he intended to honor the contract." Jetton, the trial court found, continued to communicate with Mr. Wilson, "who continued to confirm to the Jetton members that his client still fully intended to honor the contract despite the death of Mrs. Huddleston."

The trial court noted that, "[b]ased upon the assurances given by Wilson, Mrs. Huddleston's agent, that Mrs. Huddleston had agreed to extend the contract closing date, and Roger's assurances after the death of Mrs. Huddleston on April 30, 2021, the Jetton members continued to expend effort and funds . . . ." The trial court additionally found that Jetton did not assert a right to close the contract prior to May 3, 2021, "even though they had the ability to do so," because of the assurances given. The trial court noted that the assurances from Roger that the contract was still in effect and being extended occurred "at least as late as May 12, 2021,"[5] which of course was after the contract's date for closing. In connection with its finding that Jetton, "[a]ssuming an extension was in effect," continued to work on issues for the development of the subject property, the trial court specifically found, among other things, that a topographic survey had been completed in May 2021 for thousands of dollars.

After finding that Mrs. Huddleston had agreed to extend the contract and that Jetton did not seek a closing prior to the contract's closing date because it had detrimentally relied "on the assurances of Mrs. Huddleston through her agent," the trial court further found and concluded that Roger, "through his acts, conduct, and acquiescence, was willful or

identified Mrs. Huddleston's estate "And/Or" Mrs. Huddleston's heirs, including Roger, as Defendants. Later, when the complaint was amended, the caption was amended to reflect the existence of the trust and also listed Roger as a Defendant in his capacity as "Successor Trustee."

[5] The specific finding regarding May 12 appears to be an inadvertent error, and the intended reference presumably was May 10, 2021, which was the date Roger testified he had expressed his intention to follow through with the contract.

negligent with regard to the Buyer['s] belief that the contract was extended." Moreover, the trial court noted that although Roger had the ability as successor trustee to act as the seller after his mother's death and knew that Jetton believed the contract was extended, it stated that he "did nothing to assert any right against the Buyer Jetton Developments, LLC to close the contract prior to May 3, 2021, and indeed assured the Buyer on May 12, 2021,[6] that the Seller intended to follow through with the contract." Although Roger had subsequently repudiated the contract, the trial court determined that he was "estopped from denying that the contract had been extended pursuant to the doctrine of equitable estoppel" and ultimately concluded that Jetton was entitled to specific performance. This appeal followed.

## STANDARD OF REVIEW

This case was resolved following a bench trial, and as such, we review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). "[G]reat weight is given to the trial court's determinations of credibility," *Pless v. Pless*, 603 S.W.3d 753, 770 (Tenn. Ct. App. 2019), and "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Although a presumption of correctness accompanies the trial court's factual findings, the same is not true of legal issues. "[W]e review questions of law de novo with no presumption of correctness." *Sample v. Sample*, 605 S.W.3d 629, 634 (Tenn. Ct. App. 2018). "Issues regarding admission of evidence in Tennessee are reviewed under an abuse of discretion standard." *Watson v. Watson*, 196 S.W.3d 695, 702 (Tenn. Ct. App. 2005).

## DISCUSSION

In this appeal, Roger, the successor trustee,[7] raises numerous issues for our review. As discussed below, we ultimately conclude that none of the raised issues merits relief from the trial court's judgment.

*Alleged Erroneous Admission of Mr. Wilson's testimony*

The first raised concern relates to the trial court's decision to allow Mr. Wilson to testify about his phone call with Mrs. Huddleston in April 2021, specifically in relation to

---

[6] Again, as discussed in a prior footnote, the specific finding regarding May 12 here also appears to be an inadvertent error, and the intended reference presumably was May 10, 2021, the date Roger testified he had expressed his intention to follow through with the contract.

[7] Although the appellate brief appears to have been filed on behalf of all of the Defendants named in this litigation, we refer to Roger alone here, and throughout the discussion, for ease of reference.

Mr. Wilson's testimony that Mrs. Huddleston had agreed to an extension. In support of the issue devoted to this raised concern, Roger's brief examines the Dead Man's Statute codified at Tennessee Code Annotated section 24-1-203, while also arguing that Mr. Wilson's testimony regarding Mrs. Huddleston's statements constitutes inadmissible hearsay. As to the former matter of the Dead Man's Statute, some of the specifics of Roger's argument—and what he endeavors to accomplish by way of it—are somewhat unclear to us. With that said, to the extent that Roger may be contending that Mr. Wilson was barred from testifying about his April 2021 phone call because of the operation of the Dead Man's Statute, we respectfully reject the merits of such an argument. In pertinent part, the Dead Man's Statute provides as follows:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

Tenn. Code Ann. § 24-1-203. This statute simply could not potentially apply so as to bar Mr. Wilson's testimony because, as this Court has previously noted, the "Dead Man's Statute . . . applies only when the proposed witness is a party to the suit." *Logan v. Estate of Cannon*, No. E2015-002254-COA-R3-CV, 2016 WL 5344526, at *6 (Tenn. Ct. App. Sept. 23, 2016). Mr. Wilson is not a party to this case.

With respect to the specific argument that Mr. Wilson's testimony about Mrs. Huddleston's statements constitutes inadmissible hearsay, we also discern no error. Assuming arguendo that Mr. Wilson's testimony does not, as has been argued by Roger, implicate any of the hearsay exceptions under Rule 804(b) of the Tennessee Rules of Evidence, including the "statement against interest" exception at Rule 804(b)(3), we note that pursuant to Rule 803(1.2) of the Tennessee Rules of Evidence, the following is not excluded by the hearsay rule:

> A statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity, or . . . (F) a statement by a person in privity of estate with the party.

Tenn. R. Evid. 803. Here, upon questioning at the oral argument of this matter as to whether Mrs. Huddleston was a party-opponent, Roger's counsel responded as follows: "Her estate and trust is now a party, yes, your Honor." Mrs. Huddleston, the former trustee of the trust, is clearly in privity with the successor trustee, Roger, who is a party. Mrs. Huddleston's statements are therefore not excluded by the hearsay rule.

Instructive on this point is the aforecited *Estate of Cannon* decision. Among other things, the *Estate of Cannon* opinion considered whether the affidavit of one Arnold Botts

contained statements that would be inadmissible at trial. *Estate of Cannon*, 2016 WL 5344526, at *4. In the underlying case, attorney James Logan asserted that he had previously purchased an interest in certain property from Mildred Cannon and her then-husband. *Id.* at *1. Subsequent to the commencement of litigation, Ms. Cannon died, and her estate was substituted as a party. *Id.* In the affidavit at issue, Mr. Botts, who was an employee of Mr. Logan's law firm, described what he claimed to have overheard during a telephone conversation between Mr. Logan and Ms. Cannon. *Id.* at *5. As relayed by the opinion of this Court, Mr. Botts "personally heard Ms. Cannon say that she remembered selling the property to Mr. Logan and that she did not know what had happened to the deed." *Id.* In addressing the validity of Mr. Botts's affidavit in reference to Rule 803(1.2) of the Tennessee Rules of Evidence, we ultimately held as follows:

> In the instance of Mr. Botts's statement regarding what he purportedly overheard Ms. Cannon say to Mr. Logan on the telephone, Ms. Cannon's statement is an admission of a party (Ms. Cannon) offered in evidence by a party-opponent (Mr. Logan). The statement would therefore be admissible under the hearsay exception provided in Tennessee Rule of Evidence 803(1.2) . . . .

*Id.* at *6. Having dispensed with the hearsay issue raised in relation to Mr. Wilson's testimony,[8] we now turn to the heart of this appeal.

### The Trial Court's Enforcement of the Contract

Through a series of interrelated issues, Roger challenges the trial court's enforcement of the contract in this case, variously arguing that the alleged oral agreement to extend was not sufficient, that it was error to apply the defense of equitable estoppel, that Jetton breached the contract by not closing by May 3, 2021, and that the contract was not enforceable because certain contingencies had not been met.

---

[8] Roger's argument concerning the Dead Man's Statute and hearsay is devoted primarily to the subject of Mr. Wilson's testimony and, in one sense, exclusively so. Indeed, when focusing on why the trial court's error as to hearsay impacted a "substantial right," *see* Tenn. R. Evid. 103 (providing that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"), Roger's brief appears to focus singularly on the subject of Mr. Wilson's testimony. With that said, we acknowledge that Roger's brief also refers in places to the alleged error of the trial court in allowing him to testify as to his communications with his mother. To the extent that Roger's issue concerning the Dead Man's Statute and hearsay is also predicated on such communications, it is without merit. Although, unlike Mr. Wilson, Roger is a party in this case, the Dead Man's Statute could not serve as a potential bar because the testimony at issue was solicited on direct examination by counsel for Jetton during Jetton's case-in-chief. *See* Tenn. Code Ann. § 24-1-203 (providing that parties are not allowed to testify under the circumstances implicated by the statute "unless called to testify thereto by the opposite party"). As for any supposed hearsay concern, the same type of analysis concerning Mr. Wilson's testimony and Rule 803(1.2) applies.

Regarding the last of these concerns, which Roger's brief posits as an alternative issue, we are in agreement with what the trial court stated from the bench upon the closing of the proof. That is, the contingencies discussed by Roger, which primarily pertain to issues of annexation and zoning related to the subject property, were contingencies for the benefit of Jetton that could be waived. In connection with this matter, we note that the contract provided that "Buyer shall have the right to review all aspects of the Property, including but not limited to, all governmental, zoning, soil and utility service matters related thereto" and that if Jetton did not provide notice regarding its dissatisfaction with such review per the contract, "then this contingency shall be deemed to have been waived by Buyer." Similarly, regarding a rezoning contingency specifically, the contract provided that if Jetton did not provide certain notice concerning the zoning issue, "then this contingency shall be deemed to have been waived by Buyer."

As to the substantive question of the contract's extension and the failure of the parties to close by May 3, 2021, Roger generally argues against the trial court's reliance on the evidence concerning an oral agreement to extend the closing date in this case. Among other things, he cites language in the parties' contract pointing to the necessity of a writing to effectuate a change in the closing date, while also relying on the Statute of Frauds. The trial court, however, found in favor of Jetton by holding that "Seller is hereby estopped from denying that the contract had been extended pursuant to the doctrine of equitable estoppel." Within the underlying analysis in the trial court's order, the court relied on the cases of *Hinton v. Stephens*, No. W2000-02727-COA-R3-CV, 2001 WL 1176012 (Tenn. Ct. App. Oct. 4, 2001), and *Smith v. Smith*, No. M2004-00257-COA-R3-CV, 2005 WL 3132370 (Tenn. Ct. App. Nov. 22, 2005).

In the latter case of *Smith*, which involved an intrafamily transaction in real property but the absence of a writing that could be construed as meeting the requirements of the Statute of Frauds, *Smith*, 2005 WL 3132370, at *1, 6, this Court went on to discuss as follows:

> [T]he purpose of the Statute of Frauds is not to allow a party to avoid agreements he or she has made. *Cobble v. Langford,* 190 Tenn. 385, 390, 230 S.W.2d 194, 196 (1950). It has long been recognized in our courts that strict application of the Statute of Frauds can lead to evils as undesirable as those it was designed to limit or prevent. *Southern States Development Co., Inc. v. Robinson,* 494 S.W.2d 777, 781 (Tenn.Ct.App.1972). Consequently, it "should not be used to avoid contracts or to grant a privilege to a person to refuse to perform what he has agreed to do." *GRW Enterprises, Inc.,* 797 S.W.2d at 611, quoting *Cobble,* 190 Tenn. at 390, 230 S.W.2d at 196. Neither should its enforcement render it "an instrument of hardship and oppression." *Id.,* citing *Baliles,* 578 S.W.2d at 624.

> In order to prevent such results, our courts have held that in some

circumstances a party is estopped to assert the Statute of Frauds to avoid contractual undertakings in the interest of equity and fairness. Estoppel based on principles of equity may be applied in a number of situations, including to preclude assertion of the Statute of Frauds to avoid an agreement to transfer real property, and is generally described as:

> ... the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Beazley v. Turgeon,* 772 S.W.2d 53, 58 (Tenn.Ct.App.1988), quoting *Church of Christ v. McDonald,* 171 S.W.2d 817, 821 (Tenn.1943). The purpose of equitable estoppel and its objective are:

> ... to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Baliles*, 578 S.W.2d at 624.

*Id.* at *6–7 (internal footnote omitted). This Court further explained that the conduct giving rise to estoppel includes omissions as well as commissions, stating that "[s]ilence, failure to act, or acquiescence may be sufficient to invoke equitable estoppel where, in context, they reasonably mislead another." *Id.* at *8. We noted that the "basic premise is that once a party acts, or refrains from acting, in such a way as to indicate agreement, and another party reasonably relies on that indication of agreement, the first party cannot later assert a contrary position." *Id.*

In the *Hinton* case, which involved a real estate dispute and a contract that stated it could not be altered or amended except by a subsequent written agreement, *Hinton*, 2001 WL 1176012, at *1, the appellant appealed the trial court's order requiring that her house be sold to the appellee. *Id.* at *2. Although the appellant noted on appeal that no written amendment to the contract had been made, we ultimately affirmed the trial court's judgment, concluding that "the parties fully acquiesced in the extension of the contract" and specifically noting that the appellant had "sat idly" while the appellee detrimentally relied on her silence. *Id.* at *2-3.

In the course of reaching this conclusion, we noted that "[a]cquiescence arises 'where a person knows or ought to know that he is entitled to enforce his right or to impeach a transaction neglects to do so for such a time as would imply that he intended to waive or abandon his right.'" *Id.* at *3. We further noted that the doctrine of equitable estoppel is not limited to a particular factual situation and depends on the circumstances of each case. *Id.* In outlining the doctrine of estoppel, we explained as follows:

> Estoppel is an equitable doctrine which prevents a party from raising a claim or taking a legal position when her conduct with regard to that claim is contrary to her position. *See Robby's Pancake House v. Martin,* 21 B.R. 754, 758 (Bankr.E.D.Tenn.1982). "Estoppel requires (1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Id.* "The doctrine of estoppel springs from the equities of the case. It is based upon the principles of morality, as well as of public policy, or expediency." 11 TENN. JUR. *Estoppel* § 4 (1995). We also note that an interest in real estate may be acquired by estoppel. *See id.* "Equitable estoppel in the modern sense arises from the conduct of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts and his silence or negative omission to do anything." *Id.* at § 25. Moreover, we note that "the vital principle of equitable estoppel is that a person who by his language or conduct leads another to do what he would not otherwise have done may not subject such person to loss or injury by disappointing the expectations on which he acted." 31 C.J.S. *Estoppel and Waiver* § 63 (1996).

*Id.*

Here, we discern no error in the trial court's conclusion that the seller in this case should be estopped from denying that the contract had been extended. To recap, in addition to the assurances from Mr. Wilson, Mrs. Huddleston's agent, that Mrs. Huddleston had agreed to extend the contract closing date, the court noted that Roger, the successor trustee, knew that Jetton believed the contract was extended. Not only did Roger, per his own testimony, communicate his intention to follow through with the contract, he further testified that he was aware that Jetton was working on permits and taking steps to pursue closing. Of course, Jetton, the trial court found, had continued to work on issues for the development of the property with the understanding that an extension was in effect. Because we discern no error in the trial court's conclusion regarding estoppel,[9] we affirm

---

[9] As part of his argument that the trial court erred in applying the doctrine of estoppel in this case, Roger submits that the issue of whether there was an oral agreement to extend the closing date was not properly before the court and specifically contends that the issue was not tried by implied consent. In

its enforcement of the contract and reject Roger's contention that Jetton should be deemed to have been in contractual breach for failing to close prior to May 3, 2021.

In connection with our conclusion on this matter, we observe that one of the issues that Roger raises on appeal concerns the trial court's "implied finding that . . . Wilson was more credible than . . . Roger." We need not spill much ink on this issue. As we noted in the standard of review section of this Opinion, "great weight is given to the trial court's determinations of credibility," *Pless*, 603 S.W.3d at 770, and "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells*, 9 S.W.3d at 783. To the extent that certain factual findings[10] by the trial court signify a reliance on Mr. Wilson's testimony as opposed to Roger's, we discern no error.

---

support thereof, he notes that his attorney objected to Mr. Wilson's testimony about an extension of the closing date and had also objected to the questioning of Roger regarding what Mrs. Huddleston had said in early April 2021. Although objections were made, we note that the objections were *not* predicated upon the notion that the issue of a contract extension was irrelevant or not properly before the court. Instead, the objections were simply predicated upon the Dead Man's Statute and alleged hearsay concerns previously discussed herein. The objections did not, therefore, actually mount any challenge to the trying of the issue to which the evidence clearly related. As an aside, we note that at one point Roger's brief posits the matter of whether Mrs. Huddleston agreed to Jetton's request for an extension as the "primary question" to be answered in the case.

[10] As to the subject of the trial court's findings in general, we observe that Roger's brief raises an additional issue pursuant to which he requests, in the alternative, that this Court "vacate and remand" the trial court's order "because it does not properly reflect the Trial Court's exercise of independent judgment." In pursuit of relief related to this issue, Roger claims, among other things, that the issue of equitable estoppel was not raised by the trial court during its post-trial remarks from the bench. As to that matter, however, we note that the trial court's closing trial comments included the following: "Where there's been a verbal acknowledgment by Roger Huddleston we're going to close it; we intend to extend; we're going to sell it and whether that amounts to an acquiescence to allow the contract to be extended." "Acquiescence," a matter which was clearly broached by the trial court, is often used interchangeably when discussing estoppel. *See Keith v. Jackson*, No. E2012-01056-COA-R3-CV, 2013 WL 672491, at *5 (Tenn. Ct. App. Feb. 22, 2013) ("[A]cquiescence . . . may on the one hand . . . rest on the principle of ratification and be denominated an 'implied ratification,' or, on the other hand, rest on the principle of estoppel and be denominated as 'equitable estoppel.'"). Concerning the order as a whole, we do not agree with Roger that the order should be vacated. Although the order of the trial court generally adopted several of the proposed findings submitted by Jetton, the order does not create doubt for us as to whether it was actually the product of the court's independent judgment. In this regard, we note, among other things, that edits were made to the proposed findings and that additional findings on certain matters were included that had not been part of Jetton's proposed order. Of note, some of the additional findings cover matters clearly pertinent to the significant question of estoppel.

**CONCLUSION**

In light of the foregoing discussion, we affirm the judgment of the trial court and remand for such further proceedings that are necessary and consistent with this Opinion.

    s/ Arnold B. Goldin       
ARNOLD B. GOLDIN, JUDGE
